## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIANNE LOUIE, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiff,<br><br>    v.<br><br>POMDOCTOR, LTD., ZHENYANG SHI, LI XU, COGENCY GLOBAL, INC., JOSEPH STONE CAPITAL, LLC, and MARCUM ASIA CPAS, LLP,<br><br>          Defendants. | Civil Action No.<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

## COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Julianne Louie ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (i) review and analysis of regulatory filings made by PomDoctor, Ltd. ("PomDoctor" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and media reports issued by and disseminated by PomDoctor; and (iii) review of other publicly available information concerning PomDoctor.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired PomDoctor securities between October 9, 2025 and December 11, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against PomDoctor, Zhenyang Shi, Li Xu, Cogency Global, Inc., Joseph Stone Capital, LLC, and Marcum Asia CPAs, LLP (the "Defendants") under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      The Company claims to be "a leading online medical services platform for chronic diseases in China."[1] Specifically, the company states that Frost & Sullivan "ranked [them] sixth in China's internet hospital market" having achieved this by "develop[ing] a comprehensive platform that connects users with various healthcare providers, delivers cost-effective and customized healthcare solutions, and have cultivated a vibrant ecosystem around it."[2]

---

[1]      PomDoctor, *Company Profile*, https://ir.7shiliu.com/Company-Profile [https://perma.cc/2ZYQ-RDYP].

[2]      *Id.*

1

3.      The Company was founded in 2010 and is incorporated as an offshore holding company in the Cayman Islands.  Its principal place of business is located at Yongxu Industrial Park No.19-23 Hejing Road, Dongsha Street Liwan District, Guangzhou 510000 in the Peoples Republic of China.

4.      This case arises from the crash of PomDoctor's stock in December 2025, following a dramatic yet illusory run-up orchestrated by a fraudulent stock promotion scheme.  In the weeks leading up to December 10, 2025, PomDoctor's share price surged from the initial public offering price ("IPO") of $4.00 to an all-time high of $6.09, despite no fundamental news from the Company justifying such a spike.  Investigations and public reports have since revealed that PomDoctor utilized social media to orchestrate an illicit "pump-and-dump" promotion scheme to defraud investors.  These reports detail how impersonators claiming to be legitimate financial advisors touted PomDoctor in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors.

5.      This sharp rise proved short-lived.  On December 10, 2025, PomDoctor's share price abruptly crashed by approximately 91%, to $0.50.  Since then, the Company's share price has continued to decline to approximately $0.40.

6.      Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the company's business, operations, and the true nature of its securities trading activity.  Specifically, Defendants failed to disclose to investors: (i) that PomDoctor was the subject of a fraudulent stock promotion scheme involving social media-based misinformation and impersonated financial professionals; (ii) that insiders and/or affiliates used offshore or nominee accounts to facilitate the coordinated dumping of shares during a price inflation campaign; (iii) that PomDoctor's public statements and risk disclosures omitted any mention of the

false rumors and artificial trading activity driving the stock price; and (iv) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

7.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's agent for service of process, auditor, and the underwriter Defendants are located in this District.

10.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Julianne Louie, as set forth in the accompanying certification, incorporated by reference herein, purchased PomDoctor securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant PomDoctor is a Cayman Islands holding company with its principal executive offices located in Guangzhou, China.  The Company's stock trades on NASDAQ under the symbol "POM."

13.     Defendant Zhenyang Shi ("Shi") was the Company's Chief Executive Officer ("CEO") and Chairman of the Boad of Directors at all relevant times.

14.     Defendant Li Xu ("Xu") was the Company's Chief Financial Officer ("CFO") at all relevant times.

15.     Defendant Joseph Stone Capital, LLC ("Stone Capital") was the Company's underwriter for the October 9, 2025 IPO.

16.     Defendant Marcum Asia CPAs, LLC ("Marcum") was the company's auditor at all relevant times.

17.     Defendant Cogency Global, Inc. ("Cogency") was the company's agent at all relevant times.

18.     Defendants Shi and Xu (collectively, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money, and portfolio managers and institutional investors (i.e., the market).  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading

prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

19.    Defendant Marcum (the "Auditor Defendant") issued clean audit opinions on financial statements incorporated into the October 9, 2025 IPO. Additionally, Marcum was PomDoctor's auditor at the time of the IPO and had access to material non-public information during the class period. Because of their position, Marcum knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading. Furthermore, due to their position, the Auditor Defendant had the ability and opportunity to prevent issuance of the fraudulent SEC filings or cause them to be corrected. Therefore, they are also liable for the false statements pleaded herein.

20.    Defendant Stone Capital (the "Underwriter Defendant") was the "underwriter" as defined by 15 USC §80a-2(a)(40) of the Exchange Act for issuance of PomDoctor securities by way of the IPO consisting of the registration statement PomDoctor filed on September 26, 2025, ("Registration Statement") and the prospectus supplement filed on October 9, 2025 ("Prospectus") containing the materially false and misleading statements detailed in this complaint. Due to their position, the Underwriter Defendant had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected. Therefore, they are also liable for the false statements pleaded herein.

21.    Defendant Cogency (the "Agent Defendant") was the Company's agent for service of process as required by 17 CFR §249.250 of the Exchange Act for issuance of PomDoctor securities by way of the IPO consisting of the Registration Statement and Prospectus containing the materially false and misleading statements detailed in this complaint.  Due to their position, the Agent Defendant had the ability and opportunity to prevent issuance of the fraudulent Registration Statement and Prospectus, and/or cause them to be corrected.  Therefore, they are also liable for the false statements pled herein.

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading**
**Statements Issued During the Class Period**

22.    The Class Period begins on October 9, 2025, when the Company filed an IPO prospectus permitting PomDoctor to issue 5,000,004 American depository shares ("ADS"), representing 833,334 Class A ordinary shares of their common stock at an initial offering price of $4.00 per ADS for a total capital raise of $20.0M.[3]  Total outstanding shares after the IPO were disclosed to be 17,698,718 Class A and 2,042,042 Class B ordinary shares.  Therefore, the IPO represented just ~4% of total PomDoctor ownership.  In the IPO, to describe their business, the Company stated:

*We are a leading online medical services platform for chronic diseases in China, ranking sixth on China's Internet hospital market measured by the number of contracted doctors in 2022, according to Frost & Sullivan. As of December 31, 2023 and 2024, the cumulative number of contracted doctors stabilized at over 212,800, while the transacting patients increased from 654,817 as of December 31, 2023 to 699,338 as of December 31, 2024. As of December 31, 2024, our contracted doctors issued approximately 3.13 million prescriptions.*

*With focuses on chronic disease management and pharmaceutical services, our business model forms a one-stop platform for medical services, which organically connects patients to doctors and pharmaceutical products. Our experience in tackling chronic diseases can be traced back to 2015 when we launch our platform*

---

[3]    PomDoctor Ltd., Prospectus (Oct. 9, 2025).

*on mobile devices. We strategically chose to focus on this field because chronic diseases last at least one year by definition, and they are hard to cure, prone to complications and require ongoing medical attention. As such, patients with chronic diseases have a great and relatively inelastic demand for frequent and repeat follow-up visits and of drug purchases, which gives a competitive advantage to platforms that are able to maintain long-term, stable doctor-patient relationships.*

*We believe that doctors are the most important resource in the medical services industry. Hence, we have established an open Internet hospital business model that focuses on serving them. In this model, our smart online medical service platform offers a range of services and tools to facilitate online consultation and prescription, which include a WeChat official account that facilitates doctor-patient communications, and Pom Doctor, a doctor-end patient management portal. These online consultations and prescriptions are carried out during one-to-one graphic consultation sessions where the patients send texts and pictures to the doctors for diagnoses, and we plan to gradually launch phone and video consultation. Our platform only provides services for follow-up patients who already have prescriptions from separate, offline services. Our pharmacist verification system ensures that doctors' prescriptions comply with the relevant rules and regulations. After receiving prescriptions from doctors, our pharmacists will verify the prescriptions according to the Drug Administration Law. If the pharmacists find any prescription to be in any potential violation of the Drug Administration Law, they will return the prescriptions to the doctors, who must then adjust the prescriptions accordingly to ensure compliance. Otherwise, our pharmacists can deny further processing of the prescription. However, given that our platform only issues prescriptions for patient's follow-up visits and the patients would have already possessed verified prescriptions from offline channels before consulting our platform, the frequency of the aforementioned prescription return is negligible.*

*At the same time, our platform enables patients to conveniently connect with our doctors and obtain one-stop medical services, which include online consultations and online prescriptions anywhere, anytime. Because our patients were mainly sourced by doctors via existing patient-doctor relationships, their mutual trust is also transferred online, which translates into greater user stickiness on both ends and allows for great monetization potential from our treatment and prevention solutions. In each of 2023 and 2024, we achieved a retention rate for mature doctors of 99.4%, respectively. In addition, we recorded a 90-day patient repurchase rate, representing the average turnover period of the prescription drug usage, of 63.7% and 66.2% in 2023 and 2024, respectively. As chronic diseases last more than one year by definition and requires ongoing medical attention, such high 90-day patient repurchase rates encourage the patients to continue using our platform for its ease of use during the long course of their disease management and also motivates doctors to stay on the platform and serve the patients that they have*

*become familiar with in the same period, which benefits our chronic disease management business.*

*Leveraging our mature doctors' resource, we have achieved a particularly high repeat purchase rate of patients in our hepatopathy department of 72.7% and 73.9% in 2023 and 2024, respectively. We have also achieved an average revenue per paying patient on our platform of RMB766 in 2024, which increased as compared with RMB714 in 2023. Eventually, our seasoned supply chain carries out the fulfillment of the patients' orders, which both helps alleviate or eliminate their suffering and opens the door to future consultations.*

*In February 2020, we entered into an advertising framework agreement with Focus Media Inc. ("Focus Media"), pursuant to which Focus Media agreed to provide advertising service and we agreed to pay for the advertising service fee during the term from February 29, 2020 to February 28, 2021. As impacted by COVID-19, a large number of patients could not go to hospital and may seek alternative ways of on-site visit with doctors in the hospital. We believe this would be an opportunity to increase our brand recognition by cooperating with Focus Media. During the contract term, we together with Focus Media launched various advertising programs such as property advertising, smart screen advertising and elevator advertising, and incurred advertising fee of RMB221.0 million. As a result of our collaboration with Focus Media, we incurred other payables to Focus Media of RMB221.0 million in total. On August 10, 2021, we entered into tripartite agreements with Focus Media and Guangzhou Aixiangbao Investment Limited Liability Partnership ("Aixiangbao"), a wholly-owned entity by Mr. Zhenyang Shi, pursuant to which, we are released from being the obligor to Focus Media under the liability but the obligor to Aixiangbao as Aixiangbao assumed the obligation on behalf of us in the amount of RMB221.0 million, and we agreed to repay such debt to Aixiangbao. On September 10, 2021, we reached an agreement with Aixiangbao, pursuant to which we will not be required to repay the liability for five years and after then Aixiangbao can only require us to repay the liability in a non-cash method, but we still have an obligation to repay such outstanding debt. Our collaboration with Focus Media ended in February 2021 and we do not expect to launch similar campaigns in the future.[4]*

23.     The IPO also contained the following 2023 and 2024 financial results:

### Net Revenues

*Our net revenues increased by 12.4% from RMB304.9 million for the year ended December 31, 2023 to RMB342.6 million (US$46.9 million) for the year ended December 31, 2024.*

---

[4]     *Id.* at 1-2 (emphasis added).

*Net revenues from Internet hospital.  Net revenues from Internet hospital increased by 25.4% from RMB71.0 million for the year ended December 31, 2023 to RMB89.0 million (US$12.2 million) for the year ended December 31, 2024, primarily attributable to the increase in revenues generated from online pharmacy sales. Revenue from our online pharmacy sales increased from RMB69.6 million for the year ended December 31, 2023 to RMB87.8 million (US$12.0 million) for the year ended December 31, 2024, which was mainly attributable to the increase in the number of our transacting patients in 2024. Revenue from our online consultation service slightly decreased from RMB1.4 million for the year ended December 31, 2023 to RMB1.2 million (US$0.2 million) for the year ended December 31, 2024.*

*Net revenues from pharmaceutical supply chain.  Net revenues from pharmaceutical supply chain increased by 8.4% from RMB233.8 million for the year ended December 31, 2023 to RMB253.5 million (US$34.7 million) for the year ended December 31, 2024, primarily driven by the increase in our pharmacy wholesale business from RMB227.6 million in 2023 to RMB246.9 million (US$33.8 million) in 2024, as a result of our expanded wholesale customer base leveraging our platform and medical resources. Revenues from pharmacy retail sales slightly increased from RMB6.3 million for the year ended December 31, 2023 to RMB6.6 million (US$0.9 million) for the year ended December 31, 2024.*

**Cost of revenues**

*Our cost of revenues increased by 10.8% from RMB266.1 million for the year ended December 31, 2023 to RMB294.9 million (US$40.4 million) for the year ended December 31, 2024, which was consistent with our business growth. The cost of revenues in Internet hospital increased from RMB35.5 million for the year ended December 31, 2023 to RMB51.0 million (US$7.0 million) for the year ended December 31, 2024. The cost of revenues in pharmaceutical supply chain increased from RMB230.7 million for the year ended December 31, 2023 to RMB243.9 million (US$33.4 million) for the year ended December 31, 2024.*

**Gross profit and gross profit margin**

*As a result of the foregoing, we recorded gross profit of RMB38.7 million and RMB47.7 million (US$6.5 million) for the years ended December 31, 2023 and 2024, respectively. Our gross profit margin increased from 12.7% for the year ended December 31, 2023 to 13.9% for the year ended December 31, 2024. The gross profit margin of our Internet hospital decreased from 50.1% for the year ended December 31, 2023 to 42.7% for the year ended December 31, 2024, mainly attributable to the increase in the online pharmacy sales of products with lower gross profit margin. The gross profit margin of our pharmaceutical supply chain increased from 1.4% for the year ended December 31, 2023 to 3.8% for the year ended December 31, 2024, which was primarily because the gross profit margin of*

*our pharmacy wholesale customers newly obtained in 2024 was higher than that of customers in 2023.*[5]

24.    Lastly, the IPO detailed the company's strengths and strategies that would support the future growth of PomDoctor:

*We believe that the following strengths contribute to our success and differentiate us from our competitors:*

- *Innovative and efficient one-stop online medical services platform with strong CDM service capabilities across various departments;*

- *High patient loyalty due to the long-term nature of chronic diseases and the mutual trust that has developed between our doctors and patients;*

- *Well-established pharmaceutical supply chain with a complete selection of medical products and extensive supplier channels;*

- *Cutting-edge platform technology and strong research and development capabilities; and*

- *Experienced management team led by industry veterans with validation from well-renowned shareholders.*

***Our Strategies***

*We will focus on the following key growth strategies to realize our vision:*

- *Continue to recruit quality doctors onto our platform and attract more patient users;*

- *Continue to expand and strengthen our presence in key cities and provinces across China;*

- *Continue to enhance our supply chain capabilities;*

- *Continue to invest in research and development and enhance our technology capabilities;*

- *Explore new patient acquisition channels via enhanced B2B collaboration;*

- *Utilize our accumulated big data to empower the industry; and*

---

[5]    *Id.* at 93-94 (emphasis added).

- *Expand our experience and reputation in chronic diseases to more medical areas.*[6]

25.     Here, the structure of PomDoctor's IPO was intentionally designed to facilitate an eventual pump-and-dump scheme.  PomDoctor conducted a low-float IPO, offering just 833,334 shares to the public, merely 4% of total outstanding equity, while maintaining overwhelming insider control through Class B supervoting shares and offshore holding entities.

26.     The thin public float also made PomDoctor's stock uniquely susceptible to price manipulation, as even modest buying pressure could create explosive price moves.

27.     On December 3, 2025, the Company filed a Form 6-K where Defendant Shi made the following statement regarding PomDoctor's performance for the first half of fiscal year 2025:

> *The first half of fiscal year 2025 reflected our deliberate and disciplined efforts to balance business expansion with operational rigor. Despite a challenging macroeconomic environment and intensified market competition, we strived to strengthen our market coverage and penetration, while optimizing and diversifying our revenue streams through the <u>vigorous promotion of our internet-hospital services and online sales</u>. During the period, we continued to solidify our partner-doctor pool by offering higher service fees, and at the same time meaningfully enhanced our collaboration with pharmaceutical manufacturers to drive online sales and adapt to China's evolving healthcare landscape. These initiatives resulted in a 16.2% increase in net revenue, highlighted by growth of 83.2% in our online-pharmacy businesses.*
>
> *At the same time, we maintained strict cost controls and operational discipline, sustaining a stable gross profit margin of 16.2%. Gross profit increased 16.3% year over year, despite higher sales and marketing expenses, a larger contribution from lower-margin pharmacy products, and continued investments in customer acquisition. We prioritized retaining doctor resources while prudently reducing advertising spending, reinforcing the foundation for sustainable growth under a stable pharmaceutical supply chain.*
>
> *Notably, our successful initial public offering (IPO) in October provided us with additional capital resources and expanded opportunities for future growth, further enriching our strategic options and strengthening our execution capabilities.*

---

[6]     *Id.* at 3 (emphasis added).

*Looking ahead, we are confident in our ability to continue improving operational performance and creating long-term value for our shareholders.*[7]

28.    In addition to containing false and misleading statements on financial performance, Defendant Shi's December 3, 2025, statement amounts to admission of purposefully and/or recklessly facilitating the pump-and-dump scheme though "vigorous" internet promotion over the relevant period.

### Auditor Defendant Allegations

29.    The unqualified audit opinion of Marcum covering the two-year period ended December 31, 2025 was incorporated into the IPO, registration statements, prospectuses, and other "offerings" of securities the Company filed during the Class Period.  In their opinion, Marcum certified that, "[i]n our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2023 and 2024" and that the audits were conducted "in conformity with accounting principles generally accepted in the United States of America ('GAAP')" and "in accordance with the standards of the PCAOB" which "require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud."[8] They go on to affirm the procedures they performed stating:

*Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.*[9]

---

[7]    PomDoctor, Form 6-K at 1 (Dec. 3, 2025) (emphasis added).
[8]    PomDoctor Ltd., Prospectus at F-2, F-16 (Oct. 9, 2025).
[9]    *Id.* at F-2 (emphasis added).

30.    This unqualified audit report incorporated into the IPO and other SEC filings was false and misleading because PomDoctor's consolidated financial statements were not prepared in accordance with GAAP or PCAOB requirements.

31.    In issuing unqualified audit opinions on PomDoctor's financial statements—despite these GAAP and Public Company Accounting Oversight Board ("PCAOB") violations—Marcum failed to comply with the professional standards dictated by the PCAOB.  These standards required Marcum to exercise due professional care in the performance of the audit and to obtain competent, sufficient evidentiary matter to form a basis for their opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.[10]

32.    In conducting its audits, Marcum had access to the files and key employees of the Company at all relevant times.  As PomDoctor's auditor, Marcum had continuous access to and knowledge of the Company's confidential internal, corporate, financial, operating, and business information, and had the opportunity to observe and review PomDoctor's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements as well as PomDoctor's internal controls and structures.  Accordingly, Marcum was aware of significant deficiencies and material weaknesses at the Company.  Thus, had Marcum complied with PCAOB standards, they would have determined that there was no reasonable basis for their unqualified audit report because, among other things, Marcum was aware of undisclosed facts tending to seriously undermine the accuracy of its audit reports, its conformity with GAAP and the Company's reported financial metrics.

---

[10]    PCAOB, *AS 1000: General Responsibilities of the Auditor in Conducting an Audit*, https://pcaobus.org/oversight/standards/auditing-standards/details/as-1000--general-responsibilities-of-the-auditor-in-conducting-an-audit [https://perma.cc/S4PV-DDED].

**The Truth Begins to Emerge**

33.     On December 9, 2025, PomDoctor's stock reached a closing price of $5.42, with an intraday high of $5.54.   At that time, the Company had approximately $118.44M shares outstanding, giving it a market capitalization of around $642 million.

34.     During aftermarket trading hours, on December 9, 2025, PomDoctor's stock price abruptly crashed by approximately 91%.   Investigations and public reports have since revealed that PomDoctor's stock was used as a primary vehicle for an illicit "pump-and-dump" promotion scheme. Impersonators, using stolen identities of legitimate financial advisors, touted PomDoctor in online forums, chat groups, and through social media posts with sensational but baseless claims to create a buying frenzy among retail investors.   The structure of PomDoctor's public listing and low float made the scam possible.

35.     Here, Plaintiff was a victim of one such impersonator.   After clicking on a Facebook ad promoting stock advice, Plaintiff was funneled into a WhatsApp Group claiming to be the firm the advertised financial advisor worked for.   In this WhatsApp group Plaintiff was instructed to buy and hold large quantities of POM stock during the Class Period.   The level of buying POM was in such great quantities it triggered safeguards at Plaintiff's broker which she was encouraged to circumvent in order to maximize guaranteed returns.   However, in reality, this was merely a theft orchestrated by Defendants.   Below is a series of WhatsApp chats evidencing the scheme:[11]

---

[11]     Edwin Dorsey, STOPNASDAQCHINAFRAUD.COM, https://www.stopnasdaqchinafraud.com/ [https://perma.cc/P4Y8-XYAS].



36.     On December 7, 2025, The Bear Cave, a leading forensic financial research authority, published the following message calling out the PomDoctor IPO and subsequent pump and dump as a fraud:[12]

---

[12]     Edwin Dorsey, *The Bear Cave #303*, THE BEAR CAVE (Dec. 7, 2025), https://thebearcave.substack.com/p/the-bear-cave-303 [https://perma.cc/2CWW-QEY6].

## *News of the Week*

*New Paid Stock Promotions*

Notable paid stock promotion campaigns detected this week by StockPromotionTracker.com include:

- **Tiziana Life Sciences** (NASDAQ: TLSA — $207 million) paid $47,500 to Market Tips for a promotional email campaign.
- **ZenaTech** (NASDAQ: ZENA — $138 million) paid $4,600 to Financial News Media for promotional services.

Companies subject to overseas stock manipulation campaigns this week, according to screenshots shared on StopNasdaqChinaFraud.com, include **PomDoctor** (NASDAQ: POM — $649 million) and Linkhome Holdings (NASDAQ: LHAI — $197 million).

37.     Together, the facts alleged by Plaintiff and other class members, along with news releases like those of The Bear Cave prove that throughout the Class Period, PomDoctor's stock price was artificially inflated through coordinated social media campaigns which disseminated materially false and misleading information about the Company.  Through these campaigns, impersonators using stolen identities of legitimate financial advisors lured victims through Facebook/Instagram ads into private investor chat groups on platforms like WhatsApp/Messenger/Threads to circulate unfounded news and generate excitement and raise buying pressure of PomDoctor stock.

38.     The statements made by impersonators had no legitimate basis in the Company's actual operations or financial condition, yet they were presented as authoritative tips to lure retail investors into purchasing PomDoctor shares at inflated prices.  By peddling fabricated prospects of imminent corporate success, the scheme misled investors about PomDoctor's value and created artificial demand for the stock.  PomDoctor's IPO and low float were purposefully designed by Defendants to enable this fraudulent scheme to be effectuated.

16

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired PomDoctor securities between October 9, 2025 and December 11, 2025, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PomDoctor's shares actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of PomDoctor shares were traded publicly during the Class Period on the NASDAQ.  Record owners and other members of the Class may be identified from records maintained by PomDoctor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(i)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(ii)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PomDoctor; and

(iii)     to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.     The market for PomDoctor's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, PomDoctor's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired PomDoctor's securities relying upon the integrity of the market price of the Company's securities and market information relating to PomDoctor and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of PomDoctor's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PomDoctor's business, operations, and prospects as alleged herein.

47.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PomDoctor's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

**LOSS CAUSATION**

48.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49.     During the Class Period, Plaintiff and the Class purchased PomDoctor's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information

alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

50.    As alleged herein, Defendants acted with scienter since Defendants: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PomDoctor, their control over, and/or receipt and/or modification of PomDoctor's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning PomDoctor, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

51.    The market for PomDoctor's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, PomDoctor's securities traded at artificially inflated prices during the Class Period. On November 6, 2025, the Company's share price reached a Class Period high of $6.43 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of PomDoctor's securities and market information relating to the Company, and have been damaged thereby.

52.    During the Class Period, the artificial inflation of PomDoctor's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PomDoctor's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of PomDoctor and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

53. At all relevant times, the market for PomDoctor's securities was an efficient market for the following reasons, among others:

(i) PomDoctor shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(ii) as a regulated issuer, PomDoctor filed periodic public reports with the SEC and/or the NASDAQ;

(iii) PomDoctor regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(iv) PomDoctor was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for PomDoctor's securities promptly digested current information regarding PomDoctor from all publicly available sources and reflected such information in PomDoctor's share price.  Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of PomDoctor's securities at artificially inflated prices and a presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

56.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PomDoctor who knew that the statement was false when made.

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

57.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase PomDoctor's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each Defendant, took the actions set forth herein.

59.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PomDoctor's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PomDoctor's financial well-being and prospects, as specified herein.

61.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of PomDoctor's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about PomDoctor and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

62.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the

Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

63.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PomDoctor's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of PomDoctor's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired PomDoctor's securities during the Class Period at artificially high prices and were damaged thereby.

65.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that PomDoctor was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their PomDoctor securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

68.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.    Individual Defendants acted as controlling persons of PomDoctor within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which

Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.     As set forth above, PomDoctor and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 5, 2026                    **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_/s/ Sean Masson_
Sean Masson
The Helmsley Building
230 Park Ave, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
smasson@scott-scott.com

John T. Jasnoch (_pro hac vice_ forthcoming)
Mollie Chadwick (_pro hac vice_ forthcoming)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
jjasnoch@scott-scott.com
mchadwick@scott-scott.com

Tom Grady (_pro hac vice_ forthcoming)
GRADYLAW
720 Fifth Avenue South, Suite 200
Naples, Florida 34102
tgrady@gradylaw.com

_Counsel for Plaintiff and the Proposed Class_

## <u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

I, Julianne Louie, hereby certify that the following is true and correct to the best of my knowledge information and belief:

1.      I have reviewed the complaint in this action and authorized Scott+Scott Attorneys at Law to file a lead plaintiff motion on my behalf.

2.      I am willing to serve as a representative party on behalf of all persons and entities that purchased, or otherwise acquired, shares of PomDoctor, Ltd. ("POM").

3.      During the relevant period, I purchased and/or sold the security that is the subject of the complaint, as set forth in the attached **Schedule A.**

4.      I did not engage in the foregoing transactions at the direction of counsel nor in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

5.      During the three-year period preceding the date of my signing this Certification, I am serving, as a representative party or lead plaintiff on behalf of a class in the following private actions arising under the Securities Act or the Exchange Act:

    a.  *Louie v. Charming Medical Limited, et al.*, Case No.: 1:25-cv-10535-JPO

    b.  *Louie v. Picard Medical, Inc. et al.*, Case No.: 5:26-cv-01024

6.      I will not accept any payment for serving as a representative party on behalf of the Class beyond the *pro rata* share of any recovery, expert for such reasonable costs and expenses (including lost wages) directly related to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____ 2026 at _____ (city, state).
2/4/2026                          San Francisco, ca

Signed by:

_____
17D013654F0D47A...
Julianne Louie

Docusign Envelope ID: 4032D3AD-3322-460A-ABAD-F9AFFD4822C3

## SCHEDULE A

| Transaction | Date | Shares | Price |
|---|---|---|---|
| BUY | 10/21/2025 | 35,377 | $4.10 |
| SALE | 10/22/2025 | 35,377 | $4.50 |
| BUY | 10/30/2025 | 6000 | $5.18 |
| BUY | 10/30/2025 | 2895 | $5.18 |
| BUY | 10/30/2025 | 0.809 | $5.18 |
| BUY | 10/30/2025 | 1348 | $5.19 |
| BUY | 10/30/2025 | 9,633 | $5.19 |
| BUY | 10/30/2025 | 9,671 | $5.17 |
| SALE | 11/04/2025 | 0.809 | $5.74 |
| SALE | 11/04/2025 | 8895 | $5.74 |
| SALE | 11/04/2025 | 1348 | $5.74 |
| SALE | 11/04/2025 | 19,304 | $5.74 |
| BUY | 11/06/2025 | 8890 | $6.18 |
| BUY | 11/06/2025 | 1292 | $6.18 |
| BUY | 11/06/2025 | 18,284 | $6.18 |
| SALE | 11/07/2025 | 200 | $5.76 |
| SALE | 11/07/2025 | 200 | $5.82 |
| SALE | 11/07/2025 | 300 | $5.75 |
| SALE | 11/07/2025 | 325 | $5.79 |
| SALE | 11/07/2025 | 400 | $5.83 |
| SALE | 11/07/2025 | 675 | $5.74 |
| SALE | 11/07/2025 | 900 | $5.78 |
| SALE | 11/07/2025 | 5890 | $5.72 |

| SALE | 11/07/2025 | 1292 | $5.74 |
| SALE | 11/07/2025 | 18,284 | $5.73 |