**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JULIANNE LOUIE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> POMDOCTOR, LTD., ZHENYANG SHI, LI XU, COGENCY GLOBAL, INC., and JOSEPH STONE CAPITAL, LLC, <br><br> Defendants. | Case No. 1:26-cv-01013-RA-SDA <br><br><br> <u>CLASS ACTION</u> <br><br> <u>DEMAND FOR JURY TRIAL</u> |

## <u>AMENDED COMPLAINT FOR VIOLATIONS OF</u> <u>THE FEDERAL SECURITIES LAWS</u>

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION AND PLEADING STRUCTURE ..................................... 1

II.    JURISDICTION AND VENUE ................................................................................... 8

III.   PARTIES ..................................................................................................................... 9

IV.    SUBSTANTIVE ALLEGATIONS ........................................................................... 12

       A.   The Offering, the Registration Statement, and PomDoctor's Small Public
            Float ........................................................................................................... 12

       B.   The Registration Statement Omitted Joseph Stone-Specific Red Flags
            Bearing on the Underwriting, Distribution, and Supervision of
            PomDoctor's Low-Float IPO. ..................................................................... 15

       C.   Former Joseph Stone and Axos Personnel Corroborated the
            Offering-Specific Red Flags. ..................................................................... 28

V.     THE REGISTRATION STATEMENT CONTAINED FALSE AND
       MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS ............. 35

       A.   Defendants Violated Their Affirmative Disclosure Duties Under
            Item 105/Form 20-F Item 3(D) and Item 303/Form 20-F Item 5 ......................... 35

       B.   The Registration Statement's Generic Risk Warnings Were
            Materially Incomplete Half-Truths ........................................................... 39

VI.    EVENTS FOLLOWING THE IPO ............................................................................ 42

VII.   CLASS ACTION ALLEGATIONS ......................................................................... 49

VIII.  NO SAFE HARBOR ................................................................................................ 51

IX.    SECURITIES ACT CLAIMS.................................................................................... 51

X.     PRAYER FOR RELIEF ........................................................................................... 56

i

Lead Plaintiffs Paolo Roberti, Feng Jingxin, Li Jinwei, Li Zihao, and Lawrence Alkano (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs and their own transactions, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which included, without limitation: review and analysis of PomDoctor Ltd.'s filings with the U.S. Securities and Exchange Commission (the "SEC"); review and analysis of PomDoctor's press releases and other public statements; review of publicly available information concerning Defendants; and interviews conducted by Plaintiffs' investigators. Plaintiffs' investigation is continuing. Many of the facts concerning Defendants' conduct, internal communications, offering diligence, allocation decisions, customer-account information, trading surveillance, and communications with investors are known only to Defendants or are within their exclusive custody or control. Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION AND PLEADING STRUCTURE

1.    This is a federal securities class action on behalf of a Class comprising all persons and entities who purchased PomDoctor Ltd. ("PomDoctor" or the "Company") American Depositary Shares ("ADSs") [1] pursuant and/or traceable to the registration statement and prospectus issued in connection with PomDoctor's initial public offering conducted on or about October 8, 2025 (collectively, the "Registration Statement," and the "IPO" or "Offering") and were damaged thereby. [2] Plaintiffs bring this action individually and on behalf of the Class, asserting

---

[1] ADSs are U.S. dollar-denominated securities representing equity interests of a foreign issuer and are traded on U.S. exchanges through depositary arrangements.

[2] Excluded from the Class are (i) Defendants; (ii) all present and former officers, directors, or control persons of PomDoctor; (iii) any excluded person's immediate family members, legal

strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Plaintiffs' claims sound only in strict liability and negligence and do not allege fraud, scienter, recklessness, intentional misconduct, manipulation, or deceptive intent, or any claims under the Securities Exchange Act of 1934. The claims asserted herein therefore proceed under Rule 8 of the Federal Rules of Civil Procedure.

3.      Defendant PomDoctor is a Cayman Islands holding company whose stated business is conducted in China through subsidiaries and contractual arrangements with Guangzhou Qilekang Digital Health Medical Technology Co., Ltd. ("Qilekang Digital Health") and related operating entities. Defendant PomDoctor described itself in the Registration Statement as a leading online medical services platform for chronic diseases in China and represented that it ranked sixth in China's internet-hospital market in 2022 based on the number of contracted doctors.

4.      Defendant PomDoctor completed its IPO on or about October 9, 2025, selling 5,000,004 ADSs to the investing public at $4.00 per ADS. Each six ADSs represented one Class A ordinary share. On October 10, 2025, Defendant Joseph Stone Capital, LLC ("Joseph Stone") fully exercised the over-allotment option to purchase an additional 750,000 ADSs at the same $4.00 offering price. The Offering generated gross proceeds of approximately $23,000,016 before underwriting discounts, commissions, and offering expenses. PomDoctor's ADSs began trading on the Nasdaq Global Market under the ticker symbol "POM" around October 8, 2025.

5.      The Offering had several features that made the risks unusually acute.

---

representatives, heirs, successors, predecessors, or assigns; (iv) the present and former parents, subsidiaries, assigns, successors, predecessors, and affiliates of any Defendant; and (v) any entity in which any of the persons excluded under subsections (i)-(iv) has or had a material ownership interest.

6.      First, PomDoctor offered only a small nominal ADS float to public investors. The 5,000,004 ADSs sold in the base Offering represented only approximately 833,334 Class A ordinary shares because each six ADSs represented one Class A ordinary share. A small public float was material because even modest coordinated buying could create outsized upward pressure on the ADS price and the appearance of genuine investor demand.

7.      Second, PomDoctor was a Cayman Islands holding company whose stated operating business was conducted in China through subsidiaries and contractual arrangements.

8.      Third, insiders retained overwhelming voting control through Class B ordinary shares carrying 20-to-1 voting rights.

9.      Finally, PomDoctor's IPO was underwritten on a firm-commitment basis by Defendant Joseph Stone, a U.S. broker-dealer with significant public regulatory, supervisory, and personnel-related red flags. Those underwriter-specific facts were material because Joseph Stone was responsible for underwriting, allocating, distributing, and selling PomDoctor ADSs to investors.

10.      Defendant Joseph Stone was not a passive participant in the Offering. The Underwriting Agreement placed Joseph Stone at the center of the purchase, delivery, and distribution of the IPO ADSs. Joseph Stone acted as representative underwriter, and the ADSs were to be registered in the names and denominations requested by Joseph Stone. The Registration Statement also identified underwriter-related disclosures concerning allocation, electronic distribution, price stabilization, short positions, and penalty bids.

11.      Defendant Joseph Stone' public regulatory history implicated the same functions that were material to PomDoctor's low-float IPO. The Financial Industry Regulatory Authority

3

("FINRA")[3] BrokerCheck reported that Defendant Joseph Stone had five regulatory events and three arbitration disclosures.[4] Defendant Joseph Stone had been censured by FINRA in April 2025 for failing to comply with FINRA Rule 3170, the Taping Rule, including findings that its procedures were not reasonably designed to record telephone conversations with customers and that it failed to record all required conversations. FINRA also censured Defendant Joseph Stone in 2022, ordered disgorgement of $825,607.59, and found that the firm failed to identify or address red flags of excessive trading that caused customers to pay more than $1.037 million in commissions, fees, and margin interest. A 2017 state regulatory matter alleged failure to supervise, knowing substantial assistance to salespeople conducting fraudulent and unethical sales practices, and manipulative practices.

12.    Plaintiffs' investigation further corroborated that PomDoctor's susceptibility to coordinated promotion and collapse was not merely theoretical. Former Joseph Stone and Axos[5]

---

[3] FINRA is a self-regulatory organization that oversees U.S. broker-dealers and their registered representatives under the supervision of the SEC. FINRA writes and enforces rules governing broker-dealer conduct, administers licensing and qualification examinations for securities professionals, monitors market activity, and investigates potential misconduct. FINRA also operates investor-protection programs, including arbitration and mediation forums and BrokerCheck, a public database that allows investors to review the registration history, qualifications, and disciplinary disclosures of brokers and brokerage firms.

[4] Pursuant to FINRA, a "regulatory event" may involve either: (1) a final, formal proceeding initiated by a regulatory authority, such as a state securities agency, self-regulatory organization, federal regulator such as the SEC, or foreign financial regulatory body, for a violation of investment-related rules or regulations; or (2) a revocation or suspension of a broker's authority to act as an attorney, accountant, or federal contractor. Additionally, brokerage firms are not required to report arbitration claims filed against them by customers. However, BrokerCheck provides summary information regarding FINRA arbitration awards involving securities and commodities disputes between public customers and registered securities firms.

[5] BrokerCheck reported that Joseph Stone cleared its trades through Axos Clearing LLC ("Axos") under a fully disclosed clearing agreement. Axos therefore was positioned to observe account-opening materials, trading activity, customer records, and other information relevant to suspicious trading patterns.

personnel described Defendant Joseph Stone's business as focused on small China- and Asia-based issuers seeking U.S. listings, stated that Joseph Stone did not apply high standards to such issuers, and described a sales process in which brokers were allocated IPO shares to sell to retail customers through cold calling. One former Joseph Stone senior capital-markets employee confirmed that PomDoctor was a "fraudulent IPO" and that Defendant Joseph Stone "likes pump-and-dump schemes."

13.     Despite these offering-specific and underwriter-specific risks, the Registration Statement identified Defendant Joseph Stone as the underwriter but did not disclose the underwriter-specific and offering-specific facts necessary for investors to evaluate the underwriting, distribution, supervisory, and manipulation-related risks associated with this IPO. Instead, the Registration Statement offered generic warnings that PomDoctor's ADSs could be volatile, that an active trading market might not develop, that limited float and insider control could affect trading, and that investors could lose money.

14.     Having chosen to speak about the risks affecting the trading price, liquidity, and aftermarket market for PomDoctor ADSs, Defendants were required to disclose the material facts necessary to make those warnings not misleading. Defendants failed to disclose the specific and heightened risk that PomDoctor's low-float ADSs, distributed through Joseph Stone, were particularly susceptible to a pump-and-dump scheme. That risk was not based merely on Joseph Stone's disciplinary history in the abstract. It arose because the success of such a scheme depends on the same functions that Joseph Stone, as firm-commitment underwriter and FINRA-member broker-dealer, was responsible for performing or supervising: allocating IPO shares, distributing shares to retail customers, supervising customer communications, identifying concentrated or coordinated buying, monitoring account-opening and nominee-account red flags, reviewing suspicious trading patterns, and escalating compliance concerns. Joseph Stone's regulatory

5

history, recent Taping Rule violation, excessive-trading supervision failures, customer-dispute history, and concentration of associated brokers with disclosure events all implicated those same functions. Accordingly, the Registration Statement's generic warnings were materially incomplete and misleading because they did not disclose the specific risk that PomDoctor's low-float ADSs, distributed through an underwriter with red flags bearing directly on allocation, retail distribution, customer communications, and supervision, were susceptible to artificial price inflation through coordinated promotional activity, followed by a rapid collapse once artificial demand ended.

15.    Defendants also violated their affirmative disclosure duties under SEC Regulation S-K. Item 105 required the Registration Statement to disclose the material factors that made an investment in PomDoctor ADSs speculative or risky, and to do so in a manner specific to PomDoctor and the Offering rather than through generic risk warnings. Defendants failed to disclose the specific and heightened risk that PomDoctor's low-float ADSs, distributed through Joseph Stone as firm-commitment underwriter, were particularly susceptible to a pump-and-dump scheme—i.e., artificial price inflation through coordinated promotional activity, followed by a rapid collapse once artificial demand ended. This was not a generic market-volatility risk. It was a risk specific to PomDoctor and the Offering because it arose from the combination of PomDoctor's small public ADS float and Joseph Stone-specific red flags bearing on the same offering-related functions that were critical to preventing or detecting coordinated retail buying and artificial demand: allocation of IPO shares, retail distribution, customer communications, account diligence, concentration of customer positions, suspicious-trading review, and supervisory escalation. Joseph Stone's regulatory history, recent Taping Rule violation, excessive-trading supervision failures, customer-dispute history, and concentration of associated brokers with disclosure events all implicated those functions. Item 105 required Defendants to disclose this specific risk rather than

6

rely on generic warnings that PomDoctor's ADSs could be volatile or that investors could suffer losses.

16.    Defendants also violated Item 303, which required Defendants to disclose known trends, events, or uncertainties that were reasonably likely to have a material effect on PomDoctor's liquidity, capital resources, results of operations, or financial condition. The omitted facts were known or reasonably knowable to Defendants. Defendants PomDoctor and the Individual Defendants knew the Offering's structure, including the small ADS float being sold to the public, and knew that the Company's liquidity and capital resources depended on its ability to access and maintain credibility in the U.S. public markets. Defendant Joseph Stone knew, or reasonably should have known, its own regulatory history, supervisory deficiencies, customer-communication issues, associated-broker disclosure profile, and underwriting and distribution practices. Those facts bore directly on whether PomDoctor's low-float ADSs would be distributed into a broad and genuine investor base and trade in an orderly aftermarket, or instead trade in an environment vulnerable to coordinated promotion, artificial inflation, and collapse. The undisclosed risk that PomDoctor's ADSs could be artificially inflated and then collapse was reasonably likely to materially affect PomDoctor's liquidity, capital resources, access to financing, ability to use its publicly traded ADSs as consideration or compensation, and ability to maintain investor confidence.

17.    After the IPO, the omitted risk materialized. PomDoctor ADSs traded upward without Company-specific fundamentals sufficient to justify the increase. During the relevant period, retail investors were solicited through social-media and messaging applications by promoters who represented themselves as investment professionals or investment groups. These promoters provided trading instructions, instructed investors to buy and hold PomDoctor ADSs, and requested screenshots of investor orders and account positions.

18.     The promotional campaign succeeded in temporarily inflating PomDoctor's ADS price. Within weeks of the IPO, PomDoctor's ADSs rose more than 50% above the $4.00 IPO price, to more than $6.00 per ADS, without any Company-specific fundamental news sufficient to support that increase. The artificial inflation then collapsed abruptly. On December 10, 2025, PomDoctor's ADS price crashed by approximately 91%, falling to approximately $0.50 per ADS. The collapse wiped out nearly all of the market value created during the promotional campaign and injured investors who purchased PomDoctor ADSs pursuant and/or traceable to the IPO at artificially inflated prices.

19.     By the time this action commenced, PomDoctor ADSs had dropped to approximately $0.22 per ADS, approximately 94.5% below the IPO price, significantly damaging Plaintiffs and the Class.

## II.     JURISDICTION AND VENUE

20.     Plaintiffs' claims arise under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

21.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v.

22.     This Court has personal jurisdiction over each Defendant because each Defendant has sufficient minimum contacts with this District and/or the United States, and because Defendants participated in the preparation, filing, dissemination, underwriting, auditing, or use of the Registration Statement and other statements directed to U.S. investors, including investors in this District.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a). PomDoctor ADSs traded on Nasdaq; Defendants disseminated the statements alleged herein into this District; Defendant Cogency is located in this

District; Defendant Joseph Stone maintained offices in New York and conducted securities business in New York; and acts and transactions alleged herein occurred in substantial part in this District.

24.    In connection with the acts, conduct, transactions, and wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, the Internet, electronic communications, social-media platforms, messaging applications, SEC filings, and the facilities of a national securities exchange.

## III.    PARTIES

25.    Lead Plaintiff Paolo Roberti, as set forth in his certification on file with the Court (Dkt. No. 35-2) and incorporated by reference herein, purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement and was damaged thereby.

26.    Lead Plaintiff Feng Jingxin, as set forth in his certification on file with the Court (Dkt. No. 35-2) and incorporated by reference herein, purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement and was damaged thereby.

27.    Lead Plaintiff Li Jinwei, as set forth in his certification on file with the Court (Dkt. No. 35-2) and incorporated by reference herein, purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement and was damaged thereby.

28.    Lead Plaintiff Li Zihao, as set forth in his certification on file with the Court (Dkt. No. 35-2) and incorporated by reference herein, purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement and was damaged thereby.

29.    Lead Plaintiff Lawrence Alkano, as set forth in his certification on file with the Court (Dkt. Nos. 30-2, 30-3) and incorporated by reference herein, purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement and was damaged thereby.

9

30.     Defendant PomDoctor is a Cayman Islands holding company with its principal executive offices located at Yongxu Industrial Park, No. 19-23 Hejing Road, Dongsha Street, Liwan District, Guangzhou, Guangdong Province, People's Republic of China. PomDoctor's ADSs trade on Nasdaq under the ticker symbol "POM."

31.     Defendant Zhenyang Shi ("Shi") was PomDoctor's co-founder and Chief Executive Officer ("CEO") at all relevant times and has served as Chairman of the Company's Board of Directors since PomDoctor's inception. Shi signed the Registration Statement. Defendant Shi is married to Defendant Li Xu, PomDoctor's Chief Financial Officer. According to the Registration Statement, Defendants Shi and Xu beneficially owned all of PomDoctor's issued and outstanding Class B ordinary shares. As a result of Shi's sole voting power and an irrevocable voting proxy granted by Xu, Shi was able to exercise approximately 76.0% of the aggregate voting power of the Company's total issued and outstanding ordinary shares immediately after the Offering, assuming the underwriters did not exercise their over-allotment option. After Defendant Joseph Stone fully exercised the over-allotment option, Shi continued to exercise approximately 75.9% of PomDoctor's aggregate voting power, based on the Registration Statement's disclosed share and voting structure, including the 20-to-1 voting rights of the Class B ordinary shares and Xu's voting proxy.

32.     Defendant Li Xu ("Xu") was PomDoctor's co-founder and has served as the Company's financial manager since its inception. Xu has served as PomDoctor's Chief Financial Officer ("CFO") since February 2025. Defendant Xu is married to Defendant Shi, PomDoctor's Chairman and CEO. Xu signed or authorized the statements alleged herein and granted Shi the irrevocable voting proxy that allowed Shi to control all issued Class B ordinary shares.

33.     Defendant Joseph Stone Capital, LLC ("Joseph Stone" or the "Underwriter Defendant") is a registered broker-dealer and served as PomDoctor's firm-commitment

10

underwriter, bookrunner, and representative underwriter for the IPO. Joseph Stone's BrokerCheck profile identifies it as a Delaware limited liability company with main offices in Garden City, New York and New York, New York. Joseph Stone participated in the preparation, review, marketing, dissemination, underwriting, offering, and sale of PomDoctor ADSs pursuant to the Registration Statement.

34.    Defendant Cogency Global, Inc. ("Cogency") was PomDoctor's authorized U.S. representative and agent for service of process in connection with the Registration Statement. Cogency is located at 122 East 42nd Street, 18th Floor, New York, New York. Cogency was identified in the Registration Statement and facilitated PomDoctor's U.S. registration process by serving as the U.S. representative and process agent required for PomDoctor's access to the U.S. securities markets through the Offering.

35.    Defendants Shi and Xu are referred to herein as the "Individual Defendants." Because of their senior executive positions, direct involvement in PomDoctor's management, control over the Company, access to Company information, and control over PomDoctor's public statements, the Individual Defendants had the power and authority to control, and did control or influence, the contents of PomDoctor's SEC filings, public statements, press releases, and communications to investors. The Individual Defendants signed the Registration Statement. Both Shi and Xu had access to information concerning PomDoctor's business, financial condition, internal controls, offering structure, related-party transactions, and disclosures. The Individual Defendants were able to prevent the issuance of materially false or misleading statements or cause such statements to be corrected.

36.    Defendant Joseph Stone is liable under Section 11 of the Securities Act as an underwriter of PomDoctor's IPO. Joseph Stone served as the firm-commitment underwriter and representative underwriter for the Offering, participated in the offering process, and offered and

11

sold PomDoctor ADSs to investors pursuant to the Registration Statement. As underwriter, Defendant Joseph Stone was required to conduct a reasonable investigation and exercise reasonable care to ensure that the Registration Statement did not contain material misstatements or omissions.

37.    Defendant Cogency is liable under Section 11 of the Securities Act for its role in the Registration Statement. Cogency served as PomDoctor's authorized U.S. representative and agent for service of process, was identified in the Registration Statement, and facilitated PomDoctor's ability to register securities for sale to U.S. investors. By accepting and serving in that role in connection with the Registration Statement, Defendant Cogency participated in the registration process through which PomDoctor ADSs were offered to U.S. investors pursuant to the Registration Statement.

## IV.    SUBSTANTIVE ALLEGATIONS

38.    Plaintiffs' claims sound only in strict liability and negligence under the Securities Act. Plaintiffs do not allege fraud, scienter, recklessness, intentional misconduct, manipulation, deceptive conduct, or deceptive intent. The claims asserted herein proceed under Rule 8 of the Federal Rules of Civil Procedure.

### A.    The Offering, the Registration Statement, and PomDoctor's Small Public Float

39.    The Offering was conducted pursuant to Defendant PomDoctor's Registration Statement on Form F-1, as amended, and final prospectus filed with the SEC. The Registration Statement was declared effective by the SEC on September 30, 2025 and was used to offer and sell PomDoctor ADSs to the investing public beginning on or about October 8, 2025. Before the Offering, there was no public market for PomDoctor's ADSs or Class A ordinary shares.

40.    Defendant PomDoctor completed its IPO on or about October 9, 2025, selling 5,000,004 ADSs to the investing public at $4.00 per ADS. Each six ADSs represented one Class

A ordinary share. On October 10, 2025, Defendant Joseph Stone fully exercised the over-allotment option to purchase an additional 750,000 ADSs at the offering price.

41.    The Registration Statement disclosed that Defendant Joseph Stone served as the firm-commitment underwriter, bookrunner, and representative for the Offering. In connection with the Offering, PomDoctor agreed to pay Joseph Stone underwriting discounts and commissions equal to 7% of the IPO price. PomDoctor also agreed to reimburse Joseph Stone for accountable expenses, including travel, communication, due diligence, and legal-counsel fees and expenses, up to a maximum aggregate amount of $200,000, and to pay Joseph Stone a $40,000 advisory fee at closing.

42.    In the Registration Statement, Defendant PomDoctor described itself as a leading online medical services platform for chronic diseases in China. The Registration Statement stated that, as of December 31, 2024, PomDoctor had more than 212,800 contracted doctors and, according to Frost & Sullivan, ranked sixth in China's internet-hospital market in 2022 based on the number of contracted doctors.

43.    Defendant PomDoctor's operating business was not conducted directly by the Cayman Islands issuer. Instead, the Registration Statement explained that PomDoctor conducted its business through subsidiaries and contractual arrangements with Qilekang Digital Health and related operating entities in China. Through those entities and arrangements, PomDoctor operated a one-stop medical-services platform designed to connect patients with doctors and pharmaceutical products, including internet-hospital and pharmaceutical-service operations.

44.    The Offering created a small nominal public float. The 5,000,004 ADSs sold in the base Offering represented only approximately 833,334 Class A ordinary shares because six ADSs represented one Class A ordinary share. The Registration Statement further disclosed that, after conversion of PomDoctor's outstanding preferred shares immediately before the IPO, 17,698,718

13

Class A ordinary shares and 2,042,042 Class B ordinary shares would be issued and outstanding upon completion of the IPO, assuming no exercise of the over-allotment option. Thus, the base Offering represented only approximately 4.2% of PomDoctor's post-IPO outstanding ordinary shares. After Joseph Stone fully exercised the over-allotment option, the 5,750,004 ADSs sold in the Offering represented approximately 958,334 Class A ordinary shares, or approximately 4.85% of PomDoctor's total ordinary shares outstanding. This limited float was material because a security with a small public float can experience sharp price movements from relatively modest trading activity. When few shares are available for public trading, coordinated buying by even a limited number of accounts can create outsized upward pressure on the market price and the appearance of genuine investor demand.

45.    The limited float also made PomDoctor ADSs more susceptible to concentrated demand and coordinated promotional activity. In a broadly distributed offering with a large public float, artificial buying pressure is more difficult to create and sustain because more shares are available for sale and trading is less easily influenced by a small group of purchasers. By contrast, PomDoctor's small ADS float meant that coordinated purchases promoted through social-media or messaging channels could more easily move the ADS price above the IPO price without any corresponding improvement in PomDoctor's business, financial condition, or prospects.

46.    The same limited float also increased the risk of a rapid collapse. Once coordinated buying pressure ended, or once holders who benefited from the inflated price began selling into the market, the limited float could magnify the downward price movement. In that environment, the market price could fall abruptly because there was no broad, organic investor base or fundamental demand sufficient to absorb selling pressure. The limited float therefore made PomDoctor ADSs vulnerable not only to artificial price inflation, but also to a sharp reversal once the artificial demand disappeared.

47.     These risks were especially acute here because PomDoctor combined a small nominal ADS float with a China-based operating structure, concentrated insider voting control, and a firm-commitment underwriting process led by Joseph Stone. Those features increased the importance of complete and specific disclosures concerning the risks affecting the Offering, the distribution of PomDoctor ADSs, and the ADSs' aftermarket trading. e.

48.     The Registration Statement warned that "[n]o dealer, salesperson, or other person is authorized to give any information or to represent anything not contained in this prospectus or in any free writing prospectus we may authorize to be delivered or made available to you," and that investors "must not rely on any unauthorized information or representations." Because the Registration Statement instructed investors not to rely on outside information, it was especially important that the Registration Statement itself disclose the material facts necessary for investors to evaluate the Offering, including the specific risks arising from PomDoctor's small nominal ADS float and Joseph Stone's role as firm-commitment underwriter.

**B.     The Registration Statement Omitted Joseph Stone-Specific Red Flags Bearing on the Underwriting, Distribution, and Supervision of PomDoctor's Low-Float IPO.**

49.     As the IPO underwriter and FINRA-member broker-dealer, Joseph Stone was not a passive participant in the Offering. The Underwriting Agreement placed Joseph Stone at the center of the purchase, delivery, and distribution of the IPO ADSs: the Company agreed to sell the securities to the Underwriters, Joseph Stone acted as Representative, and the ADSs were to be registered in the names and denominations requested by the Representative. The Agreement also identified as "Underwriter Information" disclosures concerning the underwriters' allocation of shares, electronic distribution, and price stabilization, short positions, and penalty bids. Those provisions show that Joseph Stone had direct involvement in the mechanics of distributing IPO shares and in disclosures concerning allocation and aftermarket-related practices. Defendant

15

Joseph Stone's underwriting and distribution role was material because PomDoctor's Offering involved a small public ADS float and depended on the underwriter's diligence, allocation practices, customer communications, retail distribution, and supervisory controls.

50. Joseph Stone also operated against the background of FINRA supervisory rules applicable to broker-dealers and underwriters. FINRA Rule 3110 requires a member firm to maintain a supervisory system and written procedures reasonably designed to achieve compliance with securities laws and FINRA rules, including procedures for reviewing transactions in the firm's investment-banking and securities business and procedures for reviewing customer-facing and internal communications. FINRA guidance further recognizes that firms acting as underwriters or otherwise in furtherance of a public offering are engaged in "investment banking services," and must maintain procedures reasonably designed to identify potentially violative trades and conduct internal investigations where appropriate.

51. These obligations were especially important here because the risks alleged herein involved functions that an underwriter and broker-dealer is uniquely positioned to observe, supervise, or control: how IPO shares were allocated and distributed, whether customer communications were properly supervised, whether retail buying was coordinated, whether affiliated, nominee, or control-group accounts were identified, and whether suspicious trading patterns were detected, reviewed, and escalated. Joseph Stone's regulatory history, Taping Rule violation, excessive-trading supervision failures, customer-dispute history, and concentration of associated brokers with disclosure events implicated those same underwriting, distribution, customer-communication, and supervisory functions.

52. However, the Registration Statement omitted Defendant Joseph Stone-specific red flags bearing directly on the underwriting, distribution, and supervision of PomDoctor's low-float IPO. Those red flags were material because PomDoctor's Offering involved the retail distribution

16

of a newly listed, China-based issuer's thinly traded ADSs through a firm-commitment underwriter. In that setting, the specific and heightened risk was not based merely on Joseph Stone's disciplinary history in the abstract. Rather, it arose because the success of a pump-and-dump scheme depends on the same functions that Joseph Stone, as firm-commitment underwriter and FINRA-member broker-dealer, was responsible for performing or supervising: allocating IPO shares, distributing shares to retail customers, supervising customer communications, identifying concentrated or coordinated buying, monitoring account-opening and nominee-account red flags, reviewing suspicious trading patterns, and escalating compliance concerns. Defendant Joseph Stone's regulatory history, recent Taping Rule violation, excessive-trading supervision failures, customer-dispute history, and concentration of associated brokers with disclosure events all implicated those same functions. In these circumstances, Joseph Stone's diligence, allocation practices, customer communications, sales-practice supervision, retail distribution controls, and ability to identify suspicious trading patterns were critical to whether PomDoctor ADSs would be placed into a broad and genuine investor base, or instead into an environment vulnerable to concentrated buying, coordinated promotion, artificial price inflation, and abrupt collapse.

53.     BrokerCheck is a free online tool maintained by FINRA that allows investors to review the background of brokers, investment advisers, and brokerage firms. BrokerCheck reports provide information concerning, among other things, a broker's or firm's registration status, employment history, licenses and qualification examinations, and disclosure events, including customer complaints, arbitrations, regulatory actions, certain criminal matters, and other reportable events.

54.     BrokerCheck shows that Defendant Joseph Stone was formed in November 2011 and has been a FINRA-member broker-dealer since 2013. Joseph Stone's Nasdaq Stock Market approval became effective on September 4, 2024, approximately one year before PomDoctor's

17

IPO. Through DPMM Holdings LLC, Joseph Stone's Chief Executive Officer, Damian Maggio, owned more than 75% of Joseph Stone. Joseph Stone's BrokerCheck profile identifies the firm as engaged in multiple securities businesses, including retailing corporate equity securities over-the-counter, selling corporate debt securities, acting as an underwriter or selling-group participant for corporate securities, selling mutual funds, U.S. government securities, municipal securities, variable life insurance or annuities, put and call options, private placements of securities, and REITs. BrokerCheck also disclosed that Joseph Stone cleared its trades through Axos Clearing LLC ("Axos").

55.     Defendant Joseph Stone's BrokerCheck report disclosed five regulatory events and three arbitration events. These firm-level events were material because they concerned the same functions Joseph Stone performed in PomDoctor's IPO: underwriting diligence, retail distribution, customer communications, sales-practice supervision, and allocation oversight. Joseph Stone was the firm-commitment underwriter through which PomDoctor ADSs entered the U.S. public market. Its supervisory and compliance history therefore bore directly on the risk that PomDoctor's limited-float ADSs would be distributed and traded in a manner susceptible to artificial inflation and collapse.

56.     In April 2025, only months before PomDoctor's IPO, FINRA found that Defendant Joseph Stone failed to comply with FINRA Rule 3170, the Taping Rule. This "Rule requires that firms ensure that they tape record any means of telecommunications that is regularly used by registered persons to communicate with customers." [6] In addition, "[i]n connection with this requirement, firms should ensure that the means of telecommunications used is capable of being

---

[6]Notice to Members 98-52, SEC Approves Taping Rule, Published Date: July 01, 1998, available at https://www.finra.org/rules-guidance/notices/98-52

18

taped."[7] "The Rule also requires firms subject to the taping requirement to establish reasonable procedures for reviewing tape recordings to ensure compliance with securities laws and NASD rules, to submit reports to the NASD on their supervision of telemarketing, and to retain and catalog the tapes."[8] FINRA found that Defendant Joseph Stone's special written procedures were not reasonably designed to comply with the rule and that, in certain instances, the firm failed to record all required telephone conversations between registered persons and existing and potential customers. FINRA censured Joseph Stone and fined it $35,000.

57.     FINRA Rule 3170 is not an ordinary compliance rule. Commonly known as the "Taping Rule," it requires certain broker-dealers to implement heightened supervisory procedures when a specified portion of their registered persons previously worked at firms that were expelled from FINRA membership or had their broker-dealer registrations revoked for sales-practice violations. "The measures required by the Rule are designed to prevent a reoccurrence of sales practice abuse or other customer harm that caused the Disciplined Firm to be expelled or have its registration revoked." [9] The rule is aimed at firms that employ a significant number of representatives from "disciplined firms," because FINRA views that circumstance as creating heightened risk of fraudulent sales practices, improper telemarketing, and customer harm.

58.     According to FINRA's explanations (including NASD Notice to Members 98-52A, NASD Notice to Members 02-61, NASD Notice to Members 05-46, FINRA Regulatory Notice 14-10, and FINRA Regulatory Notice 21-09), a firm subject to the Taping Rule must establish, maintain, and enforce special written supervisory procedures for the telemarketing activities of all registered persons. Those procedures must include recording telephone conversations between

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

registered persons and existing or potential customers, reviewing those recordings for compliance with securities laws and FINRA rules, retaining the recordings for at least three years, cataloging them by registered person and date, and submitting quarterly reports to FINRA concerning supervision of telemarketing activities.

59.    The Taping Rule therefore created a category of records directly relevant to PomDoctor's IPO and aftermarket trading. If Defendant Joseph Stone was required to maintain recordings, review records, written supervisory procedures, and quarterly reports to FINRA, those materials could show what Defendant Joseph Stone registered persons told customers, whether supervisors identified red flags, how the firm monitored sales activity, and whether the firm complied with heightened supervision obligations. Joseph Stone's failure to comply with the Taping Rule in 2025 was material because PomDoctor's IPO involved the distribution of a thinly traded foreign issuer's ADSs to the public in circumstances where customer communications, retail solicitation, and supervision of sales activity were critical.

60.    Pursuant to the BrokerCheck report, Defendant Joseph Stone's regulatory history also included serious excessive-trading and supervisory findings. In September 2022, FINRA found that Joseph Stone failed to establish, maintain, and enforce a supervisory system and written supervisory procedures reasonably designed to comply with FINRA suitability requirements concerning excessive trading. FINRA found that Joseph Stone's written procedures did not provide reasonable guidance on how to identify accounts that were being excessively traded, how to apply relevant review factors, what steps supervisors should take after identifying excessive trading, or whether and when supervisors should restrict commissions in customer accounts.

61.    FINRA further found that Defendant Joseph Stone failed on numerous occasions to identify accounts with red flags of excessive trading, including accounts with cost-to-equity ratios greater than 20%, and that the firm's system for responding to such red flags was unreasonable.

20

FINRA found that trades recommended in such accounts resulted in annualized turnover rates ranging from 6 to 57 and annualized cost-to-equity ratios ranging from 21% to 96%, making it unlikely that customers' accounts would reach their break-even points or earn a positive return. Collectively, the trading caused customers to pay more than $1.037 million in commissions, fees, and margin interest. Defendant Joseph Stone was censured, ordered to pay restitution of $825,607.59, and required to implement heightened supervision for certain registered representatives and policies, procedures, and systems to identify and respond to red flags of potentially excessive trading.

62.    Joseph Stone's BrokerCheck report also disclosed a 2017 regulatory action by the state of Montana concerning Joseph Stone's sales practices, customer communications, and supervision. The Montana action alleged, among other things, failure to supervise, knowing substantial assistance to salespeople conducting fraudulent and unethical sales practices, and manipulative practices. The matter was resolved with a $10,000 monetary sanction and $30,000 restitution. Reuters reported in its June 12, 2017 article, "*Wall Street's self-regulator blocks public scrutiny of firms with tainted brokers*" ("Reuters Article"), that Montana investigated Joseph Stone after one of its sales representatives cold-called the office of Montana's Commissioner of Securities and Insurance to pitch an investment, and that Montana investigators ultimately found "fraudulent and unethical" practices, including excessive trading in client accounts, with commissions totaling 28% of the $877,493 invested by Montana clients.

63.    Defendant Joseph Stone's senior personnel held roles that made these risks especially important. Joseph Stone's BrokerCheck profile identified Damian Maggio as its Chief Executive Officer and Anthony Joseph Graziano as its Chief Compliance Officer. Maggio was also identified as the managing member of DPMM Holdings LLC, the entity owning 75% or more of Joseph Stone. Jon Alan Nixon was identified as Joseph Stone's Financial and Operations

21

Principal, or FINOP, a registered supervisory role responsible for broker-dealer financial and operational compliance, including financial responsibility, books and records, and regulatory reporting.

64. Graziano's BrokerCheck report disclosed one final regulatory event, three customer disputes, and two financial events. In the final FINRA matter, Graziano consented to sanctions and findings that he failed reasonably to supervise a registered representative who excessively traded a customer account. FINRA found that the customer paid almost $120,000 in commissions and other trading costs and that the account had a cost-to-equity ratio of approximately 22%, meaning the account needed to generate an annual return of approximately 22% just to break even after trading costs.

65. Maggio's BrokerCheck report disclosed two customer-dispute events, including a pending FINRA arbitration against Joseph Stone alleging failure to supervise and seeking more than $2.8 million in damages.

66. Separately, Separately, Plaintiffs' review of BrokerCheck records shows that ordinary investors could not obtain Joseph Stone's full personnel-level risk profile from a centralized disclosure. Plaintiffs reviewed approximately 189 BrokerCheck search-result entries for individuals associated with Joseph Stone, then checked individual BrokerCheck pages and detailed reports to determine whether each person was associated with Joseph Stone during the relevant period and whether that person had reportable disclosure events or other information relevant to Joseph Stone's underwriting, distribution, customer-communication, supervisory, or compliance functions specifically in connection with the PomDoctor IPO. That review identified approximately 27 FINRA-regulated brokers associated with Joseph Stone during the relevant period. Plaintiffs' review therefore required searching, verifying, and aggregating individual BrokerCheck records rather than relying on a single firm-level disclosure showing the

22

concentration of Joseph Stone-associated brokers with disclosure events. At least 16 of the approximately 27 FINRA-regulated brokers, or approximately 59.3%, had disclosure events. This concentration of FINRA-regulated personnel with disclosure histories was relevant to Joseph Stone's supervisory, sales-practice, customer-communication, and compliance environment, particularly given Joseph Stone's role as PomDoctor's firm-commitment underwriter and representative underwriter.

| No. | Joseph Stone-associated broker | BrokerCheck disclosure events | Registered with Joseph Stone Since |
|---|---|---|---|
| 1 | John Emil Fendrich Jr. (CRD No. 1791002) | 1 regulatory event | May 5, 2023 |
| 2 | Roger T. Spann (CRD No. 2211632) | 7 customer disputes; 1 termination; 5 judgments/liens | May 21, 2018 |
| 3 | Laurence C. Pettit III (CRD No. 2215495) | 1 criminal event; 10 customer disputes | May 17, 2018 |
| 4 | Omar Fernandez (CRD No. 2262319) | 1 judgment/lien | May 21, 2018 |
| 5 | Joseph A. Salino Jr. (CRD No. 2557935) | 1 customer dispute; 8 judgments/liens | May 22, 2018 |
| 6 | Anthony J. Graziano (CRD No. 2862096) | 1 regulatory event; 3 customer disputes; 2 financial events | June 5, 2015 |
| 7 | Damian Maggio (CRD No. 2864247) | 2 customer disputes | February 26, 2013 |
| 8 | John S. Baek (CRD No. 3188422) | 1 customer dispute | June 20, 2023 |
| 9 | Imtiaz A. Khan (CRD No. 4084250) | 1 regulatory event; 1 customer dispute | August 6, 2018 |
| 10 | Manuel P. Ramos (CRD No. 4085247) | 1 regulatory event; 4 judgments/liens | May 21, 2018 |

| No. | Joseph Stone-associated broker | BrokerCheck disclosure events | Registered with Joseph Stone Since |
|---|---|---|---|
| 11 | Adam Maggio (CRD No. 4177365) | 1 regulatory event; 2 criminal events; 4 customer disputes | February 26, 2013 |
| 12 | Nigel R. James (CRD No. 4490687) | 1 regulatory event; 6 customer disputes | February 26, 2013 |
| 13 | Miguel A. Murillo (CRD No. 4875997) | 3 regulatory events; 3 customer disputes; 1 judgment/lien | November 24, 2014 |
| 14 | Christian M. Martinez Sustache (CRD No. 7315704) | 1 financial event | February 22, 2024 |
| 15 | Ibrahim Ethem Kurtulus (CRD No. 2287372) | 4 regulatory events; 3 customer disputes; 1 termination; 1 judgment/lien | June 8, 2018 |
| 16 | Dorian Morgan Dyckman (CRD No. 5653349) | 1 customer dispute; 1 termination | June 13, 2025 |

67.     The table above further shows the materiality of the Joseph Stone-specific red flags omitted from the Registration Statement. A reasonable IPO investor would consider it important that the firm-commitment underwriter responsible for distributing a small, China-based issuer's ADSs had firm-level and personnel-level regulatory and disclosure issues bearing on supervision, sales practices, compliance, customer communications, allocation practices, and distribution oversight.

68.     Joseph Stone's risk profile was material because it related directly to the mechanism by which a low-float IPO can become vulnerable to manipulation. A pump-and-dump scheme depends not only on the issuer's public float, but also on how shares are allocated and distributed, whether customer communications are properly supervised, whether retail buying is coordinated, whether nominee or control-group accounts are identified, and whether suspicious

trading patterns are detected and escalated. Those are precisely the functions that an underwriter and broker-dealer is positioned to monitor, and they are the same functions implicated by Joseph Stone's regulatory history, Taping Rule violation, excessive-trading supervision failures, customer-dispute history, and concentration of associated brokers with disclosure events.

69.    Public availability of isolated individual BrokerCheck records did not disclose Joseph Stone-specific and Offering-specific risks alleged herein. BrokerCheck allowed investors to search individual brokers and firms, but. the Reuters Article reported that FINRA does not release BrokerCheck data in bulk form, such as a searchable database that would allow investors or researchers to identify firms with unusually high concentrations of brokers with regulatory sanctions, customer-dispute payments, terminations after misconduct allegations, financial distress, or other FINRA disclosure flags.

70.    Reuters also reported that FINRA had internally identified 90 firms as posing the highest risk to investors and had flagged those firms for heightened scrutiny, but declined to publicly name them or release firm-level concentration statistics. FINRA officials acknowledged to Reuters that longstanding hiring practices at certain firms posed a "threat" to investors.

71.    The relevant information therefore was not simply that individual Joseph Stone-associated brokers had isolated BrokerCheck disclosures. The relevant and material information was the firm-level concentration of disclosure histories at Joseph Stone and what that concentration meant for underwriting diligence, retail distribution, customer communications, allocation controls, supervision, and aftermarket-risk monitoring in a small foreign-issuer IPO. That firm-level information required database analysis of FINRA records, manual updating of BrokerCheck materials, and aggregation across individual brokers—precisely the type of analysis Reuters reported FINRA would not make available through bulk FINRA data.

25

72.     Reuters' analysis illustrates why Joseph Stone's personnel profile was material. Reuters identified 48 firms where at least 30% of brokers had one or more of the 12 most serious FINRA disclosure flags, compared with 9% of brokers industry-wide. Reuters specifically identified Joseph Stone, reporting that approximately 71% of Joseph Stone's 59 brokers had FINRA flags on their records at that time. Reuters also reported that Joseph Stone had been investigated by Montana securities regulators after a cold call to the office of Montana's securities regulator, and that Montana investigators found "fraudulent and unethical" practices, including excessive trading in client accounts.

73.     The 2017 Reuters article, however, did not place PomDoctor IPO investors in possession of current, offering-specific information concerning Joseph Stone's risk profile in 2025. The article was published approximately eight years before PomDoctor's October 2025 IPO. It did not disclose Joseph Stone's then-current personnel composition, the then-current concentration of Joseph Stone-associated brokers with FINRA disclosure events, Joseph Stone's 2022 FINRA supervisory sanction, Joseph Stone's 2025 FINRA Taping Rule sanction, or the underwriting, allocation, distribution, customer-communication, and aftermarket-risk facts specific to PomDoctor's Offering.

74.     Nor did Joseph Stone's own BrokerCheck report adequately apprise ordinary PomDoctor IPO investors of the Joseph Stone-specific and offering-specific risks alleged here. BrokerCheck's summary disclosure showed only that Joseph Stone had reportable firm-level events; it did not explain how those events related to PomDoctor's Offering or to Joseph Stone's role in underwriting, allocating, distributing, and supervising the sale of a low-float, China-based issuer's ADSs. Nor did BrokerCheck disclose whether Joseph Stone's sales force, investment-banking personnel, clearing relationship, customer-communication practices, allocation procedures, and supervisory systems created a heightened risk that PomDoctor ADSs would be

26

distributed and traded in a manner susceptible to coordinated promotion, artificial inflation, and collapse.

75.     The omitted information was not merely that Joseph Stone had a disciplinary history in the abstract. The omitted information was that Joseph Stone's regulatory history, recent Taping Rule violation, excessive-trading supervisory failures, customer-arbitration history, concentration of associated brokers with disclosure events, and offering-related business practices bore directly on the same underwriting, allocation, retail distribution, customer-communication, and supervisory functions that were critical to preventing PomDoctor's low-float ADSs from becoming vulnerable to manipulation. A generic BrokerCheck event count did not disclose those connections and did not cure the Registration Statement's failure to disclose them.

76.     Thus, neither historical Reuters reporting nor isolated BrokerCheck disclosures cured the Registration Statement's failure to disclose the specific and heightened risk alleged here: that PomDoctor ADSs were susceptible to artificial inflation through coordinated promotional activity, followed by a rapid collapse once artificial demand ended. That risk was directly connected to Joseph Stone's role as firm-commitment underwriter. In a small, low-float IPO, Joseph Stone was not merely a name on the cover of the Registration Statement; it was the gatekeeper responsible for underwriting diligence, investor allocation, distribution, customer communications, and supervision of the sales process. Those functions bore directly on whether IPO shares were placed into a broad and genuine investor base or instead into an environment vulnerable to concentrated buying, coordinated retail promotion, nominee or control-group activity, and other red flags associated with pump-and-dump manipulation.

27

**C.**      **Former Joseph Stone and Axos Personnel Corroborated the Offering-Specific Red Flags.**

77.      Former Joseph Stone and Axos personnel corroborated the same offering-specific red flags that were omitted from the Registration Statement. Their accounts confirm that Defendant Joseph Stone's risk profile was not merely historical or abstract, but related directly to Defendant Joseph Stone's business model, sales practices, clearing relationship, customer-communication practices, allocation practices, and approach to small China-based IPOs. Those facts bore directly on the risk that PomDoctor's low-float ADSs would be artificially inflated through coordinated promotional activity and then collapse once artificial demand ended.

78.      A former Joseph Stone Senior Vice President of Capital Markets ("CW-1") was a Chartered Financial Analyst with decades of brokerage-industry experience. CW-1 stated that he joined Joseph Stone in approximately 2020 as Senior Vice President of Capital Markets. FINRA BrokerCheck reflected that CW-1 was registered with Joseph Stone from December 2020 to July 2025. CW-1 stated that he was hired to help Joseph Stone identify "legitimate IPOs" for the firm to underwrite in the United States and that, if an issuer he introduced to Joseph Stone went public, he was supposed to receive a finder's fee.

79.      CW-1's role gave him direct exposure to Joseph Stone's China- and Asia-focused IPO pipeline. CW-1 stated that the firms he targeted were based in China and the rest of Asia. He personally traveled to Asia at his own expense, spoke with local contacts, examined company financial statements, and looked for companies interested in going public in the United States. When CW-1 identified companies interested in a U.S. listing, he introduced them to Joseph Stone's investment-banking team, which then "took over." CW-1 stated that there were "many people" at Joseph Stone making introductions of Asian companies to Joseph Stone's investment-banking team.

28

80.     CW-1 further stated that, through his work identifying and evaluating small China- and Asia-based IPO candidates for Joseph Stone, his interactions with Joseph Stone personnel, IPO clients, and investors, and his exposure to Joseph Stone's IPO pipeline and practices, he observed that PomDoctor was a "fraudulent IPO." CW-1 also stated that Joseph Stone "likes pump-and-dump schemes," an assessment he formed through his IPO-related work with Joseph Stone clients and investors. CW-1 also stated that the use of online platforms such as WhatsApp to promote PomDoctor shares would be consistent with the practices and risks he observed in connection with Joseph Stone's small-company IPO business.

81.     A former Joseph Stone investment-banking intern ("CW-2") worked at Joseph Stone from April to June 2025, only months before PomDoctor's IPO. CW-2's internship involved assisting mostly Chinese companies that were working with Joseph Stone to go public on U.S. markets, mainly Nasdaq. CW-2 analyzed financial data for those companies to help Joseph Stone make financial projections about their expected performance after listing. CW-2 also assisted with "simulating roadshows" for those companies.

82.     CW-2 stated that the companies he analyzed had "very low revenue" and that "all the companies were from China." CW-2 described Joseph Stone as an intermediary connecting Chinese companies with the U.S. market, particularly Chinese companies that did not understand U.S. policy. CW-2 stated that it appeared the Chinese companies chose Joseph Stone through pre-existing personal connections with the firm.

83.     CW-2 further stated that, in his view, the IPOs appeared to be a way for Chinese companies to make money because, after several months, shareholders could not exit profitably once the stocks dropped sharply. CW-2 stated that Joseph Stone did not have high standards for the quality of Chinese issuers it underwrote. He explained that underwriting requires standards, but that he knew the companies could not reach the revenues projected for them. According to

29

CW-2, Defendant Joseph Stone tried to select small companies "even if they can't grow in the future," and then "make the financial data better."

84.    CW-2 explained that he and other interns reviewed issuers' trailing revenues and prepared post-IPO growth projections for simulated roadshows. CW-2 stated that his team would ask prospective issuers to "make the data better" by showing high growth. As an example, CW-2 described using aggressive price-to-earnings assumptions for an issuer with high fixed costs and little chance of rapid near-term growth. CW-2's account supports that Joseph Stone's IPO process for Chinese issuers involved aggressive projections and valuation assumptions for companies with limited revenues and uncertain growth prospects.

85.    A former Joseph Stone investment-banking employee ("CW-3") worked in Joseph Stone's investment-banking department and reported to Joseph Fallarino. CW-3 confirmed that he left Joseph Stone in approximately 2021. CW-3 stated that his job involved selling shares in companies preparing to go public through Joseph Stone. According to CW-3, a typical scenario was that a senior member of the investment-banking department would go onto the sales floor and announce a new IPO. The investment-banking employees were told how many shares needed to be sold. CW-5 recalled instructions along the lines of: "We have 5 million shares of ABC Corp. that we need to sell pre-IPO. We don't know the stock price yet, but here are the shares to sell." Each broker was then allocated a certain number of pre-IPO shares to sell to clients through cold calling.

86.    CW-3 stated that he would call his clients and tell them they were "getting in on the ground floor." CW-3 told IPO customers that they had to hold their shares for at least three months after the issuer went public. CW-5 was also usually given a post-IPO target price before recommending that his customers sell. CW-5's account supports that Joseph Stone was not merely a passive underwriter, but an active distributor and promoter of IPO inventory to retail customers,

30

and that Joseph Stone knew how customers were being induced to buy and hold small-company IPO shares.

87.     CW-3 also described terminology and practices at Joseph Stone that directly relate to post-IPO price support and coordinated trading. CW-3 stated that phrases such as "supporting the stock," "creating momentum," and "maintaining liquidity" were commonly used at Joseph Stone in reference to pre- and post-IPO shares. CW-3 stated that "holding the bid" meant that Joseph Stone was "keeping the price where they want it." When asked what that meant, CW-3 explained that "we have to sell a certain amount" to maintain the target price. CW-3 identified Joseph Fallarino, "Damian," and Damian's brother as people who discussed "holding the bid" with investment-banking employees.

88.     CW-3 further acknowledged that there was a "pre-agreed time to sell" IPO shares that Joseph Stone investment-banking employees had sold to clients. CW-3 described this as a "program" arranged and agreed upon by certain senior executives at Joseph Stone. According to CW-3, the program gave "large buys and sells" to Fallarino, Damian Maggio, and Adam Maggio, Damian's brother. CW-5 also stated that Adam focused on "logistics," including broker-license paperwork and "lawsuits."

89.     CW-3 stated that concentrated customer accounts were common at Joseph Stone. According to CW-3, if there was a "hot tip," a customer could have 80% of the account in one issuer. CW-3 further stated that when an issuer was small, Joseph Stone "probably owned 80% of the float." CW-3 explained that Joseph Stone bought shares from the issuer before the IPO, that Joseph Stone owned the pre-IPO shares because senior personnel told the sales floor "we have this—go get money," and that customers who bought pre-IPO shares were buying them from Joseph Stone.

31

90. CW-3 also stated that during the three-month post-IPO window when customers were told they could not sell, "the insiders at Joseph Stone sold at a profit." CW-3 further stated that Joseph Stone made money through markups on shares sold to customers and from its own internally held shares increasing in value before being sold. These facts directly support the materiality of Joseph Stone's allocation, distribution, holding-instruction, and aftermarket practices in connection with small-company IPOs.

91. CW-3 also described compliance and recordkeeping practices that support the inference that customer communications and sales materials were important and potentially problematic. CW-3 stated that FINRA conducted examinations once every year or two and that Joseph Stone knew in advance when the exams would occur. According to CW-3, the investment-banking team would receive instructions to "clean everything up," which Joseph Stone brokers understood to mean that "if you have to get rid of it, get rid of it." CW-3 stated that brokers used "pre-written pitches" to sell shares to customers, that FINRA did not permit those pre-written pitches, and that those documents were shredded or otherwise disposed of before FINRA exams. CW-3 stated that he would place his pitch book in his car before examiners arrived so they would not see it.

92. CW-3 also provided information concerning customer qualifications and account-opening practices. CW-3 stated that an investor was supposed to have $1 million in liquidity to open an account at Joseph Stone. But CW-3 stated that if a customer's net worth was $600,000, Joseph Stone personnel would tell the customer to say they had $1 million. CW-3 added that "if we have to bend the rules to help them get their account open," they would do so. These allegations directly concern the same customer-account diligence, suitability, and clearing-firm inquiry issues that were material to the distribution of a low-float IPO.

93.     Another former Joseph Stone private wealth adviser ("CW-4") worked at Joseph Stone during the 2023 to 2024 period. CW-4 stated that Joseph Stone frequently worked with companies based in China to underwrite U.S. IPOs. Although CW-4 did not personally work on Chinese IPOs, he stated that his American clients often sought to "speculate" in U.S. issuers by holding positions for only a week or two in order to profit from a typical post-offering price increase. CW-4 further stated that Joseph Stone was "definitely not" the only boutique brokerage that floated a small number of shares in the market, set the share price at $4 or $5, and then "manipulates" the price.

94.     Another former Joseph Stone investment adviser ("CW-5") worked at Joseph Stone during the period when the firm was underwriting IPOs of Chinese issuers. CW-5 stated that he was aware Joseph Stone underwrote IPOs of Chinese issuers because that occurred during his association with the firm. CW-7 recalled a "Chinese lady" in charge of the Chinese IPO business. CW-5 stated that he did not join Zoom meetings during the pandemic to discuss upcoming Chinese IPOs because he did not trust Chinese companies and considered himself "more conservative." CW-5's account further corroborates that Joseph Stone's Chinese IPO business was known internally and involved dedicated personnel and meetings.

95.     A former Axos compliance officer ("CW-6") worked at Axos Clearing from approximately 2015 to 2021 and later became Chief Compliance Officer at an Axos affiliate, Axos Invest. CW-6 explained that Axos performed trade surveillance and generally became aware of suspicious activity through those reviews. According to CW-6, when suspicious activity appeared, the review would lead to examination of customer account applications and account paperwork. CW-6 further explained that broker-dealers underwriting IPOs of China-based issuers often involved a small "control group" that owned most of the shares. CW-6 stated that the control group was not necessarily affiliated with the issuer or the broker-dealer, and that broker-dealers

33

underwriting IPOs of Chinese issuers were often not aware of who the control group was. CW-6 also stated that broker-dealers that lured nonqualified investors into such IPOs often failed to provide required prospectuses and disclosure documents and failed to follow suitability requirements.

96.    Another former Axos senior compliance and risk principal ("CW-7") worked at Axos from approximately October 2023 to October 2025, a period that included the PomDoctor IPO. CW-7 stated that Joseph Stone was "difficult to deal with," took a long time to respond to questions from Axos compliance, did not have a good reputation at Axos, and was known to deal with many small companies going public.

97.    BrokerCheck did not disclose these internal facts. It did not disclose that former Joseph Stone personnel described the firm's business as focused on small China- and Asia-based issuers seeking U.S. listings; that Joseph Stone allegedly lacked high standards for those issuers; that Joseph Stone personnel used aggressive projections and valuation assumptions in simulated roadshows; that pre-IPO shares were allegedly sold to retail customers through cold calling; that brokers were allocated shares to sell; that customers were told they were "getting in on the ground floor"; that customers were told to hold shares after the issuer went public; that Joseph Stone personnel used terms such as "supporting the stock," "creating momentum," "maintaining liquidity," and "holding the bid"; that there were allegedly pre-agreed sell times; that Joseph Stone allegedly held substantial portions of the float in small issuers; or that insiders allegedly sold at a profit while retail customers were told to hold.

98.    BrokerCheck likewise did not disclose the Axos-related facts that suspicious activity could trigger review of customer applications and account paperwork, that China-based IPOs often involved a small control group owning most of the shares, that Joseph Stone allegedly took a long time to respond to Axos compliance inquiries, that Joseph Stone allegedly had a poor

34

reputation at Axos, or that Joseph Stone allegedly was known to deal with many small companies going public. These facts were material because they bore directly on the underwriting, distribution, customer-communication, allocation, account-opening, clearing, and supervisory functions that made PomDoctor's low-float ADSs susceptible to artificial price inflation through coordinated promotional activity, followed by a rapid collapse once artificial demand ended.

99.     These accounts are mutually reinforcing. They show that PomDoctor's IPO fit within a Joseph Stone business model focused on small China-based issuers, aggressive projections, low-float IPO inventory, retail solicitation, customer holding instructions, and aftermarket price expectations, against the backdrop of prior regulatory findings concerning inadequate supervision, customer-communication failures, and excessive trading.

100.    These accounts also connect Joseph Stone's firm-level risk profile to PomDoctor's susceptibility to pump-and-dump manipulation. The witnesses described the same features that made PomDoctor's ADSs vulnerable: small China-based issuers, limited-float share structures, retail solicitation, pre-IPO share distribution, customer holding instructions, post-IPO target prices, "holding the bid," concentrated accounts, and potential control-group ownership. Those facts made the Registration Statement's generic warnings materially incomplete because they did not disclose the specific and heightened risk that PomDoctor ADSs would be artificially inflated through coordinated promotional activity and then collapse once artificial demand ended.

## V.    THE REGISTRATION STATEMENT CONTAINED FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

### A.    Defendants Violated Their Affirmative Disclosure Duties Under Item 105/Form 20-F Item 3(D) and Item 303/Form 20-F Item 5

101.    Defendants had independent affirmative disclosure duties under SEC disclosure rules applicable to PomDoctor's Registration Statement. Regulation S-K governs the disclosure obligations imposed on registrants filing registration statements under the Securities Act.

35

PomDoctor filed its Registration Statement on Form F-1. Form F-1 requires foreign private issuers to furnish the information required by Form 20-F.

102. Item 3(D) of Form 20-F requires a registrant to disclose, under the heading "Risk Factors," the risk factors that are specific to the company or its industry and that make an offering speculative or high risk. The instructions require the issuer to explain clearly how each risk affects the issuer or the securities being offered. These requirements are materially similar to Item 105 of Regulation S-K, which requires disclosure of the material factors that make an investment in the registrant or offering speculative or risky and discourages generic risk-factor disclosure that could apply to any issuer or any offering.

103. Defendants violated Item 3(D) of Form 20-F and Item 105 because the Registration Statement failed to disclose the specific and heightened risk that PomDoctor ADSs were susceptible to artificial inflation through coordinated promotional activity, followed by a rapid collapse once artificial demand ended. Specifically, Defendants failed to disclose:

(a) That PomDoctor's low-float ADS structure, newly listed China-based issuer status, and concentrated insider voting control made its ADSs particularly susceptible to concentrated buying, coordinated retail promotion, artificial price inflation, and abrupt collapse;

(b) That Joseph Stone's then-current risk profile was not merely historical or abstract, but bore directly on the offering-related functions critical to preventing or detecting coordinated retail buying and artificial demand, including IPO-share allocation, retail distribution, customer communications, account diligence, concentration of customer positions, suspicious-trading review, and supervisory escalation; and;

(c) That, although the Registration Statement identified Joseph Stone as the firm-commitment underwriter, it did not disclose the Joseph Stone-specific facts showing that

36

its allocation, retail-distribution, customer-communication, and supervisory red flags created a heightened risk that PomDoctor ADSs would not be placed into a broad and genuine investor base, but instead into an environment vulnerable to concentrated buying, coordinated promotion, artificial inflation, and collapse.

104.    These risks were specific to PomDoctor and the Offering. They arose from the combination of PomDoctor's low ADS float, newly listed China-based issuer status, concentrated insider control, and Joseph Stone-specific underwriting, distribution, customer-communication, supervisory, and personnel red flags.

105.    Generic warnings that PomDoctor's ADS price could be volatile, that the stock market could experience broad price and volume fluctuations, that an active trading market might not develop, or that investors could suffer losses did not satisfy Item 105 or Item 3(D). Those warnings described risks that could apply to many public companies. They did not specifically disclose why PomDoctor's Offering was speculative or risky in the manner alleged here — namely, that its low-float ADS structure and underwriter-specific distribution risks made the ADSs vulnerable to coordinated promotion, artificial price inflation, and collapse.

106.    Defendants also violated Item 5 of Form 20-F, which imposes disclosure obligations materially similar to Item 303 of Regulation S-K. Item 5 requires foreign private issuers to discuss known trends, uncertainties, demands, commitments, or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity, or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition. Item 5 also requires disclosure of other information necessary for investors to understand the company's financial condition, changes in financial condition, and results of operations.

107.    The SEC has long recognized that MD&A disclosure is intended to allow investors to view the registrant through management's eyes by providing both historical and prospective analysis of the registrant's financial condition and results of operations. Item 303 and Item 5 require disclosure of known trends and uncertainties unless management determines that a material effect on financial condition or results of operations is not reasonably likely to occur.

108.    Defendants violated Item 5 of Form 20-F and Item 303 because the undisclosed risks alleged above were known or reasonably knowable and were reasonably likely to have a material effect on PomDoctor's liquidity, capital resources, access to the U.S. public markets, and ability to maintain investor confidence. The omitted facts also made PomDoctor's reported financial information and offering disclosures materially incomplete because investors could not evaluate whether the IPO and aftermarket demand for PomDoctor ADSs reflected genuine investor interest or a fragile trading environment vulnerable to artificial inflation and collapse.

109.    The omitted facts were particularly material because PomDoctor's public-market access and liquidity depended on the success and integrity of the IPO and aftermarket trading in its ADSs. The Registration Statement did not disclose the risk that the ADSs would be artificially inflated and then collapse. That risk was reasonably likely to affect PomDoctor's liquidity, capital resources, access to financing, ability to use its publicly traded ADSs as consideration or compensation, and ability to maintain investor confidence.

110.    Defendants therefore failed to disclose material risks and uncertainties required to be stated in the Registration Statement. These omissions violated Item 105 and Item 303, as incorporated through Form F-1 and Form 20-F, and separately rendered the Registration Statement's generic risk warnings materially misleading.

38

**B.      The Registration Statement's Generic Risk Warnings Were Materially Incomplete Half-Truths**

111.      The Registration Statement included generic warnings concerning volatility, trading risk, market uncertainty, internal controls, and possible investor losses. The Registration Statement stated that "[t]he trading price of the ADSs is likely to be volatile, which could result in substantial losses to investors." It further stated that the ADS trading price could fluctuate widely due to broad market and industry factors, including the performance and market-price fluctuations of other companies with business operations mainly in China. The Registration Statement also warned that any of those factors could result in large and sudden changes in the volume and price at which the ADSs would trade and that the stock market in general experiences price and volume fluctuations often unrelated or disproportionate to operating performance. Specifically, the Registration Statement stated that:

> ***The trading price of the ADSs is likely to be volatile, which could result in substantial losses to investors.***
> The trading price of the ADSs is likely to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, including the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. In addition to market and industry factors, the price and trading volume for the ADSs may be highly volatile for factors specific to our own operations, including the following:
> •      actual or anticipated variations in our revenues, earnings, cash flow, and changes or revisions of our expected results;
> •      fluctuations in operating metrics;
> •      announcements of new investments, acquisitions, strategic partnerships, or joint ventures by us or our competitors;
> •      announcements of new products and services and expansions by us or our competitors;
> •      changes in financial estimates by securities analysts;
> •      announcements of studies and reports relating to the quality of our product and service offerings or those of our competitors;
> •      changes in the economic performance or market valuations of other online hospitals, pharmaceutical supply chain and offline retail pharmacy companies;
> •      conditions in China's digital healthcare market;
> •      detrimental negative publicity about us, our competitors, or our industry;
> •      additions or departures of key personnel;

39

- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities;
- regulatory developments affecting us or our industry;
- general economic or political conditions in China or elsewhere in the world;
- fluctuations of exchange rates between the RMB and the U.S. dollar; and
- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which the ADSs will trade. Furthermore, the stock market in general experiences price and volume fluctuations that are often unrelated or disproportionate to the operating performance of companies like us. These broad market and industry fluctuations may adversely affect the market price of our ADSs. Volatility or a lack of positive performance in our ADS price may also adversely affect our ability to retain key employees, most of whom have been granted equity incentives.

112.    These warnings were materially incomplete and misleading. Defendants did not merely fail to predict future stock-price volatility. Rather, having chosen to speak about the risks affecting the trading price, volume, liquidity, and aftermarket performance of PomDoctor ADSs, Defendants were required to disclose the material facts that made the warned-of volatility materially different from ordinary market volatility. It omitted the following material facts:

(a)    That PomDoctor's low-float ADS structure, newly listed China-based issuer status, and concentrated insider voting control made its ADSs particularly susceptible to concentrated buying, coordinated retail promotion, artificial price inflation, and abrupt collapse;

(b)    That Joseph Stone's then-current risk profile was not merely historical or abstract, but bore directly on the offering-related functions critical to preventing or detecting coordinated retail buying and artificial demand, including IPO-share allocation, retail distribution, customer communications, account diligence, concentration of customer positions, suspicious-trading review, and supervisory escalation; and

(c)    That, although the Registration Statement identified Joseph Stone as the firm-commitment underwriter, it did not disclose the Joseph Stone-specific facts showing that

40

its allocation, retail-distribution, customer-communication, and supervisory red flags created a heightened risk that PomDoctor ADSs would not be placed into a broad and genuine investor base, but instead into an environment vulnerable to concentrated buying, coordinated promotion, artificial inflation, and collapse.

113.    Those omitted facts rendered the Registration Statement's generic warnings misleading because they showed that the risk was not ordinary market volatility. The omitted risk was specific to PomDoctor's Offering: that PomDoctor's low-float ADSs, distributed through an underwriter with supervisory, customer-communication, allocation, distribution, and personnel red flags, were susceptible to artificial price inflation through coordinated promotional activity, followed by a rapid collapse once artificial demand ended.

114.    The Registration Statement's generic volatility warnings did not disclose that the same functions central to preventing manipulation in a low-float IPO—share allocation, retail distribution, customer communications, account diligence, detection of concentrated or coordinated trading, and escalation of suspicious trading patterns—were implicated by Joseph Stone's regulatory history and business practices. Nor did the Registration Statement disclose that Joseph Stone's own recent and historical red flags bore directly on whether PomDoctor ADSs would be distributed into a broad and genuine investor base or into an environment vulnerable to concentrated buying, coordinated retail promotion, nominee or control-group activity, artificial price inflation, and abrupt collapse.

115.    A reasonable investor would not have understood from the Registration Statement's generic warnings that PomDoctor's Offering combined a low-float China-based issuer, concentrated insider control, no established U.S. trading market, and an underwriter with specific supervisory, customer-communication, allocation, retail-distribution, and personnel red flags. Those omitted facts altered the total mix of information available to investors because they showed

41

that PomDoctor's ADSs were not merely subject to ordinary volatility, but were particularly susceptible to the kind of coordinated promotion, artificial inflation, and collapse that occurred.

116.    The Registration Statement's other disclosures did not cure these omissions. Disclosures concerning PomDoctor's controlled-company status, foreign-private-issuer status, and general trading risks did not disclose the specific risk that PomDoctor's ADSs could be used in a pump-and-dump scheme. Nor did they disclose the underwriter-specific and distribution-specific facts necessary for investors to evaluate whether Defendant Joseph Stone's role increased the risk that PomDoctor's low-float ADSs could be used in a pump-and-dump scheme and artificially inflated through coordinated promotional activity and then collapse once artificial demand ended.

117.    Accordingly, the Registration Statement omitted material facts necessary to make its risk disclosures concerning volatility, trading, liquidity, market risk, and investor losses not misleading.

## VI.    EVENTS FOLLOWING THE IPO

118.    After the IPO, PomDoctor ADSs traded materially above the $4.00 offering price without Company-specific fundamental news sufficient to explain the increase. Within weeks of the IPO, PomDoctor's ADS price rose more than 50%, reaching more than $6.00 per ADS. This increase occurred during the same period in which retail investors were being solicited through social-media channels and private messaging applications to buy and hold POM ADSs.

119.    The promotional campaign targeted ordinary retail investors through platforms including WhatsApp, Messenger, Threads, WeChat, Facebook, and Instagram. Promoters presented themselves as legitimate investment professionals or members of investment groups, gave investors specific price targets and holding instructions, and requested screenshots of purchase orders, account positions, or holdings. The screenshot and video requests were significant because they reflected an effort to verify, monitor, and coordinate retail buying activity.

42

120.    One set of WhatsApp instructions identified PomDoctor as the "Second Member Stock for October," listed the ticker as "POM," set a buy limit price of $4.14, identified the time-in-force as good-till-canceled, claimed an expected return of 15% to 30%, and set a holding period of three to seven trading days. The message instructed the recipient to set the buy limit price strictly according to the promoter's instructions. It further instructed the investor to take a screenshot after purchase and send it back so that the promoter could enter the purchase into an "AI Dynamic Profit System" and notify the investor when to sell at a profit.



*Example of PomDoctor trading instruction requesting screenshots after purchase.*

43

121.    Other messages used technical-analysis language and short-term target prices to create the appearance of professional investment advice. For example, a December 8 message titled "Premium Trading Strategy" identified POM as the stock code, instructed investors to buy at the market price, set a five-to-seven-trading-day holding period, identified a short-term target of $7 to $8, claimed potential profit of 40% to 50%, and stated that POM had entered a "very clear short-term profit window."



*Example of December 8 promotional message identifying POM as a premium trading strategy with a $7-$8 target.*

122.    On December 9, 2025, promoters continued instructing investors to add to their POM positions. One message labeled "POM - December 9th Add-on Strategy" listed a buy price of $5.41, a holding period of five to seven trading days, a short-term target of $7 to $8, and potential profit of 40% to 50%. The message stated that POM had entered a short-term profit window and instructed the investor to send a photo of the pending order so the promoter could check it.



45

*Example of December 9 add-on strategy directing an investor to add to a POM position and send a photo of the pending order.*

123.   Additional group-chat messages described POM as an "Institutional Focus Stock," claimed it had already delivered gains to members who followed the strategy, and stated that POM remained poised to reach a 20% target range. The messages urged investors to contact the promoter immediately for an "optimal entry range" and warned that the day remained the final window to add to positions.



*Example of group-chat promotion describing POM as an institutional focus stock and urging additional purchases.*

124.    Another December 9 message gave investors a five-star "Capital Focus Stock" recommendation, instructed them to purchase at an exact limit price of $5.37, recommended allocating 100% of available funds, set a holding period of five to eight trading days, and identified a target price of approximately $6.36. The message warned investors not to use a market order and instructed them to use the exact price to avoid a higher cost basis, thereby reinforcing the appearance of coordinated trade instructions rather than ordinary investment commentary.



*Example of December 9 group message instructing investors to buy POM at a specified limit price and allocate 100% of available funds.*

125. The promotional activity created the false appearance that market interest in PomDoctor was genuine and based on legitimate investment analysis. In reality, the promotion generated artificial demand for a thinly traded ADS and exposed retail investors to a sudden collapse once the artificial buying pressure ended.

126. On December 9, 2025, PomDoctor ADSs closed at approximately $5.42 and reached an intraday high above $5.50. At that time, PomDoctor had approximately 118.44 million shares outstanding, giving the Company a market capitalization of roughly $642 million. The elevated trading price was not supported by any corresponding Company-specific fundamental development sufficient to explain the increase.

127. The artificial inflation collapsed abruptly. During aftermarket trading on December 9, 2025 and regular trading on December 10, 2025, PomDoctor's ADS price fell approximately 91%, dropping to roughly $0.50 per ADS. The collapse was not tied to ordinary Company-specific negative news or a broad market movement. It followed the same promotion-driven pattern alleged herein: a newly listed, thinly traded IPO stock was promoted through online channels, retail buying pressure created artificial demand, and the price collapsed when promotional support ended.

128. The collapse erased nearly all of the market value created during the promotional campaign and damaged investors who purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement at artificially inflated prices. By the time this action commenced, PomDoctor ADSs traded at approximately $0.22 per ADS, representing a decline of approximately 94.5% from the $4.00 IPO price.

## VII.   CLASS ACTION ALLEGATIONS

129.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a Class comprising  all persons and entities who purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement issued in connection with PomDoctor's IPO conducted on or about October 8, 2025, and were damaged thereby.

130.   Excluded from the Class are: (i) Defendants; (ii) all present and former officers, directors, or control persons of PomDoctor; (iii) any excluded person's immediate family members, legal representatives, heirs, successors, predecessors, or assigns; (iv) the present and former parents, subsidiaries, affiliates, successors, predecessors, and assigns of any Defendant; and (v) any entity in which any person excluded under subsections (i) through (iv) has or had a controlling or material ownership interest.

131.   The members of the Class are so numerous that joinder of all members is impracticable. PomDoctor sold 5,000,004 ADSs in the IPO at $4.00 per ADS. Joseph Stone then fully exercised the over-allotment option to purchase an additional 750,000 ADSs at the IPO price. PomDoctor's ADSs traded on Nasdaq under the ticker symbol "POM." While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least hundreds, if not thousands, of Class members. Record owners and other members of the Class may be identified from records maintained by PomDoctor, its transfer agent, Joseph Stone, Axos, Nasdaq, brokers, and other third parties, and may be notified of the pendency of this action by mail, email, publication, or other customary forms of notice used in securities class actions, including notice of the opportunity to exclude themselves from the Class.

49

132.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and all Class members purchased PomDoctor ADSs pursuant and/or traceable to the materially misleading Registration Statement , and were damaged thereby.

133.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

134.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Registration Statement contained untrue statements of material fact, omitted material facts required to be stated therein, or omitted material facts necessary to make the statements therein not misleading;

(b) whether the Registration Statement's risk disclosures concerning volatility, trading, liquidity, market risk, investor losses, PomDoctor's business and financial condition, and Joseph Stone's role as underwriter were materially false or misleading;

(c) whether Defendants violated Item 105 of Regulation S-K, Item 303 of Regulation S-K, Form F-1, and/or Form 20-F by failing to disclose material offering-specific risks, trends, uncertainties, and facts concerning PomDoctor's low-float ADS structure and Joseph Stone-specific underwriting, allocation, customer-communication, distribution, and supervisory risks;

(d) whether Defendants were strictly liable or negligent under Section 11 of the Securities Act;

(e) whether the Individual Defendants controlled PomDoctor within the meaning of Section 15 of the Securities Act;

(f) whether Plaintiffs and the Class purchased ADSs pursuant and/or traceable to the Registration Statement; and

(g) the proper measure of damages sustained by Plaintiffs and the Class.

135.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

50

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

136.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

137.    There will be no difficulty in the management of this action as a class action.

## VIII.    NO SAFE HARBOR

138.    The statutory safe harbor for forward-looking statements does not apply. The challenged statements and omissions concerned then-existing facts and risks, including PomDoctor's offering structure, ADS float, Joseph Stone-specific underwriting and distribution risks, susceptibility to coordinated promotion, and the materially incomplete nature of the Registration Statement's generic risk warnings.

139.    To the extent any challenged statement is deemed forward-looking, it was not accompanied by meaningful cautionary language identifying the specific risks alleged herein, and Defendants acted with actual knowledge or severe recklessness.

## IX.    SECURITIES ACT CLAIMS

### COUNT I

**Violations of Section 11 of the Securities Act**
**(Against All Defendants)**

140.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

141.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and the Class, against all Defendants.

51

142. This Count does not sound in fraud. Plaintiffs do not allege, for purposes of this Count, that any Defendant acted with scienter, fraudulent intent, recklessness, intentional misconduct, manipulation, or deceptive intent. This Count is based solely on strict liability as to PomDoctor and negligence as to the remaining Defendants.

143. PomDoctor was the issuer and registrant for the IPO. The Registration Statement was filed with the SEC, declared effective, and used to offer and sell PomDoctor ADSs to the investing public.

144. The Registration Statement contained untrue statements of material fact, omitted material facts required to be stated therein, and omitted material facts necessary to make the statements therein not misleading.

145. PomDoctor is strictly liable under Section 11 for the materially false and misleading Registration Statement. As issuer and registrant, PomDoctor is liable for the untrue statements and omissions contained in the Registration Statement, regardless of fault.

146. The Individual Defendants signed the Registration Statement and/or were directors or senior officers of PomDoctor at the time of the IPO. The Individual Defendants participated in the preparation, review, approval, and issuance of the Registration Statement and caused PomDoctor ADSs to be offered and sold to the investing public pursuant thereto. The Individual Defendants had a duty to make a reasonable and diligent investigation of the truthfulness and completeness of the statements contained in the Registration Statement and to ensure that the Registration Statement did not omit material facts required to be stated therein or necessary to make the statements therein not misleading.

147. Defendant Joseph Stone served as PomDoctor's firm-commitment underwriter and representative underwriter for the IPO and qualifies as an underwriter under Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). Joseph Stone participated in the solicitation, offering,

distribution, and sale of PomDoctor ADSs to the investing public pursuant to the Registration Statement. As underwriter, Joseph Stone had a duty to conduct a reasonable and diligent investigation of the truthfulness and completeness of the Registration Statement, including the offering-specific risks created by PomDoctor's low-float ADS structure and Joseph Stone's own underwriting, allocation, retail-distribution, customer-communication, supervisory, and compliance functions.

148.    Cogency served as PomDoctor's authorized U.S. representative and agent for service of process in connection with the Registration Statement. Cogency was identified in the Registration Statement and participated in the U.S. registration process that allowed PomDoctor, a foreign private issuer, to access the U.S. public markets through the IPO. To the extent Cogency signed, authorized, consented to, or otherwise caused the filing and effectiveness of the Registration Statement in its capacity as PomDoctor's authorized U.S. representative, Cogency is liable under Section 11.

149.    None of the Defendants, other than PomDoctor as issuer, made a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Registration Statement were true, complete, and not misleading. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

150.    The misstatements and omissions alleged herein concerned existing facts and then-existing risks at the time of the IPO. They were not forward-looking statements. The Registration Statement did not properly identify the omitted facts as forward-looking, and the omitted facts concerned the actual structure, risks, underwriter-specific circumstances, and offering-related conditions existing at the time PomDoctor ADSs were offered and sold to the investing public.

151.    Plaintiffs and the Class purchased PomDoctor ADSs pursuant and/or traceable to the Registration Statement issued in connection with the IPO.

152.    Plaintiffs and the Class were damaged when the truth concerning the risks concealed by the Registration Statement was revealed, the artificial inflation in PomDoctor ADSs collapsed, and the value of PomDoctor ADSs declined substantially.

153.    At the time of their purchases, Plaintiffs and other Class members did not know, and could not reasonably have discovered, the facts concerning the untrue statements and omissions alleged herein.

154.    This claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years of the effective date of the Registration Statement. It is therefore timely.

155.    By reason of the conduct alleged herein, each of the Defendants violated Section 11 of the Securities Act and is liable to Plaintiffs and the Class for damages.

**COUNT II**
**Violations of Section 15 of the Securities Act**
**(Against the Individual Defendants)**

156.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

157.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Plaintiffs and the Class, against the Individual Defendants.

158.    This Count does not sound in fraud. Plaintiffs do not allege, for purposes of this Count, that the Individual Defendants acted with scienter, fraudulent intent, recklessness, intentional misconduct, manipulation, or deceptive intent.

159.    The Individual Defendants were controlling persons of PomDoctor within the meaning of Section 15 of the Securities Act by virtue of their positions as directors and/or senior officers of PomDoctor, their ability to control or influence PomDoctor's business, operations,

54

disclosures, and IPO process, and their power to cause PomDoctor to issue the Registration Statement.

160.    The Individual Defendants had the power and influence to cause PomDoctor to engage in the acts alleged herein. They participated in, authorized, signed, approved, or controlled the filing and dissemination of the Registration Statement. They were in positions to control, and did control or influence, the contents of the Registration Statement, including the risk disclosures and omissions alleged herein.

161.    The Individual Defendants also had direct and indirect business, personal, financial, and control relationships with PomDoctor, its subsidiaries, and other directors, officers, and significant shareholders. Through those relationships and their positions at PomDoctor, the Individual Defendants possessed the power to direct or influence PomDoctor's management, policies, disclosures, and IPO-related conduct.

162.    PomDoctor violated Section 11 of the Securities Act as alleged above. By virtue of their control over PomDoctor, the Individual Defendants are jointly and severally liable under Section 15 for PomDoctor's Section 11 violations.

163.    Plaintiffs and the Class purchased or otherwise acquired PomDoctor ADSs pursuant and/or traceable to the Registration Statement and were damaged thereby.

164.    This claim is brought within one year after discovery of the untrue statements and omissions in the Registration Statement, and within three years of the effective date of the Registration Statement. It is therefore timely.

165.    By reason of the conduct alleged herein, the Individual Defendants violated Section 15 of the Securities Act and are liable to Plaintiffs and the Class for damages.

55

## X.      PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief against Defendants as follows:

A.      Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives and Lead Counsel as Class Counsel;

B.      Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and other costs; and

D.      Awarding Plaintiffs and the Class such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury for all claims.

Dated: July 10, 2026

New York, New York

Respectfully submitted,

THE ROSEN LAW FIRM, P.A.
By: /s/ Phillip Kim
Phillip Kim
Laurence M. Rosen
Jing Chen
275 Madison Avenue, 40th Floor
New York, NY 10016
(212) 686-1060
philkim@rosenlegal.com
lrosen@rosenlegal.com
jchen@rosenlegal.com

-and-

POMERANTZ LLP

By: /s/ Jeremy A. Lieberman
Jeremy A. Lieberman
J. Alexander Hood II
Samantha Daniels
600 Third Avenue, 20th Floor
New York, NY 10016
(212) 661-1100
jalieberman@pomlaw.com
ahood@pomlaw.com
sdaniels@pomlaw.com

*Co-Lead Counsel for Plaintiffs and the Class*

57