**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PAOLO ROBERTI, FENG JINGXIN, LI JINWEI, LI ZIHAO, and LAWRENCE ALKANO, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

POMDOCTOR, LTD., ZHENYANG SHI, LI XU, COGENCY GLOBAL, INC., and JOSEPH STONE CAPITAL, LLC,

Defendants.

Case No. 1:26-cv-01013-RA-SDA

CLASS ACTION

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE POMDOCTOR DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND TO COGENCY GLOBAL INC.'S JOINDER**

# TABLE OF CONTENTS


I. PRELIMINARY STATEMENT .......... 1

II. STATEMENT OF FACTS .......... 2

A. PomDoctor Sells A 4% Float To Retail Investors Through A Single Small Broker-Dealer. .......... 2

B. The Registration Statement Warned Of Generic Volatility, Not The Offering-Specific Risk. .......... 4

C. The Omitted Risk Materializes. .......... 5

III. ARGUMENT .......... 5

A. The Registration Statement's Risk Warnings Were Misleadingly Incomplete. .......... 6

1) Having Spoken On The Aftermarket Volatility Risk, PomDoctor Had To Tell The Whole Truth. .......... 6

2) The Registration Statement Did Not Disclose The Risk. .......... 9

B. The Registration Statement Omitted A Risk Factor That Item 105/3.D Required. .......... 12

1) Item 105 Reaches Risks Specific To "The Offering," Which The Registration Statement Failed To Include. .......... 12

2) The Omitted Risk Was Specific To This Offering, Not Generic To Every Security. .......... 15

C. The Registration Statement Omitted A Known Uncertainty Under Item 303/Item 5. .......... 18

1) The AC Pleads The Required Nexus To Liquidity And Capital Resources. .......... 18

2) The Omitted Risk Was Known And Knowable Before The IPO. .......... 19

D. The AC Pleads the Omission Was Material, Which Cannot Be Resolved On This Motion. .......... 22

E. Negative Causation Is An Affirmative Defense That Cannot Be Resolved On The Pleadings. .......... 24

F. The Section 15 Claim Is Adequately Pleaded. .......... 25

G. The Section 11 Claim Against Cogency Is Adequately Pleaded. .......... 25

IV. CONCLUSION .......... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005) ....................11

*In re Am. Int'l Grp. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ....................10

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019) ....................8

*Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*,
2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ....................17

*Bruder v. Plug Power Inc.*,
2026 WL 2905418 (N.D.N.Y. Sep. 28, 2026) ....................9

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) ....................13, 17

*In re Didi Glob. Inc. Sec. Litig.*,
2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ....................*passim*

*Dodona I, LLC v. Goldman, Sachs & Co.*,
847 F. Supp. 2d 624 (S.D.N.Y. 2012) ....................7

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.*,
343 F.3d 189 (2d Cir. 2003) ....................25

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ....................20

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ....................*passim*

FAST Act Modernization and Simplification of Regulation S-K, Securities Act Release
No. 33-10618, 84 Fed. Reg. 12674, 12689 (Apr. 2, 2019)....................13, 14, 16, 17

*Garnett v. RLX Tech. Inc.*,
632 F. Supp. 3d 574 (S.D.N.Y. 2022) ....................9, 23

*Glenmede Tr. Co. v. Infinity Q Cap. Mgmt. LLC*,
248 A.D.3d 562 (1st Dep't 2026) ....................26

*Gutman v. Lizhi Inc.*,
633 F. Supp. 3d 681 (E.D.N.Y. 2022) ....................17, 22

*Halperin v. eBanker USA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002) ....................9

*In re Hub Cyber Sec. Ltd.*,
2025 WL 872078 (S.D.N.Y. Mar. 20, 2025) ........ 12, 17, 20, 25

*Hunt v. All. N. Am. Gov't Income Tr.*,
159 F.3d 723 (2d Cir. 1998) ........ 10

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016) ........ 17

*In re Initial Pub. Offering Sec. Litig.*,
241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........ 13, 23

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) ........ 24

*Lian v. Tuya Inc.*,
2024 WL 966263 (S.D.N.Y. Mar. 5, 2024) ........ 17, 20, 21

*Lian v. Tuya Inc.*,
2025 WL 733253 (S.D.N.Y. Mar. 7, 2025) ........ 9, 11, 20

*In re Liberty Tax, Inc. Sec. Litig.*,
435 F. Supp. 3d 457 (E.D.N.Y. 2020) ........ 19

*Litwin v. Blackstone Grp.*,
634 F.3d 706 (2d Cir. 2011) ........ *passim*

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ........ 26

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........ 23

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ........ 9, 24

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ........ 5, 16, 26

*Olkey v. Hyperion 1999 Term Tr.*,
98 F.3d 2 (2d Cir. 1996) ........ 10

*Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*,
799 F. Supp. 3d 310 (S.D.N.Y. 2025) ........ *passim*

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008) ........ 21

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) ........ *passim*

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628 (S.D.N.Y. Sep. 27, 2020) ........ 17

*In re ProShares Tr. Sec. Litig.*,
728 F.3d 96 (2d Cir. 2013) .......... 10, 12

*In re Qudian Inc. Sec. Litig.*,
2019 WL 4735376 (S.D.N.Y. Sep. 27, 2019) .......... 23

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) .......... 11

*Rubinstein v. Credit Suisse Grp. AG*,
457 F. Supp. 3d 289 (S.D.N.Y. 2020) .......... 17, 23

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .......... 9, 21

*Shetty v. Trivago N.V.*,
796 F. App'x 31 (2d Cir. 2019) .......... 19

*Sills v. United Nat. Foods, Inc.*,
2024 WL 4188324 (S.D.N.Y. Sep. 13, 2024) .......... *passim*

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008) .......... 16

*TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*,
2025 WL 416872 (E.D.N.Y. Feb. 6, 2025) .......... 9

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
985 F.2d 1190 (2d Cir. 1993) .......... 10, 23, 24

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016) .......... 25

*Wandel v. Gao*,
590 F. Supp. 3d 630 (S.D.N.Y. 2022) .......... 17, 22

*Wang v. Cloopen Grp. Holding Ltd.*,
661 F. Supp. 3d 208 (S.D.N.Y. 2023) .......... *passim*

*Winter v. Stronghold Digit. Mining, Inc.*,
686 F. Supp. 3d 295 (S.D.N.Y. 2023) (Abrams, J.) .......... *passim*

*In re WorldCom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004) .......... 14, 24

*Yannes v. SCWorx Corp.*,
2021 WL 2555437 (S.D.N.Y. June 21, 2021) .......... 21

*Yaroni v. Pintec Tech. Holdings Ltd.*,
600 F. Supp. 3d 385 (S.D.N.Y. 2022) .......... 9

**Statutes**

15 U.S.C. § 77f(a) .......... 25

15 U.S.C. § 77k(a)(1) ....................25

Securities Exchange Act of 1934 ....................5, 16, 17, 26

**Other Authorities**

17 C.F.R. § 229.105(a) ....................12, 17, 18

17 C.F.R. § 229.503(c) ....................13

17 C.F.R. § 230.408(a) ....................6

Fed. R. Civ. P. 8 ....................5, 22

Fed. R. Civ. P. 12 ....................25

FINRA Rule 3170 (2026) ....................3

FTSE Russell, *Russell US Equity Indexes: Construction and Methodology* § 5.10.1 (v7.2, Aug. 2026) ....................15

https://www.sec.gov/Archives/edgar/data/1877971/000121390025054956/ea0200019-14.htm ....................21

https://www.sec.gov/Archives/edgar/data/1877971/000121390025092301/ea0200019-21.htm ....................25

Phil Mackintosh & Nicole Torskiy, *Most Index Stock Floats Are Over 80%,* Nasdaq Index Rsch. & Insights (Nov. 6, 2025). ....................15

https://site.warrington.ufl.edu/ritter/files/2015/06/Multiple-Bookrunners-in-IPOs-2007-12-06.pdf ....................15

Weihua Li et al., *Wall Street's Stamp of Legitimacy Fuels Suspected Pump-and-Dump Schemes, Bloomberg (Jan. 29, 2026).* ....................17

## I. PRELIMINARY STATEMENT

In October 2025, PomDoctor Ltd. ("PomDoctor" or "the Company") went public by selling just four percent of its shares, 5,000,004 ADSs at $4.00, to retail investors through a single, small broker-dealer, Joseph Stone Capital, LLC ("Joseph Stone"). FINRA censured Joseph Stone six months earlier for supervisory failures, 59% of its brokers had problematic FINRA events, and its former employees describe a firm that placed small China-based IPOs with cold-called retail customers, told them when to hold and at what price to sell, and "h[eld] the bid" in the meantime while the firm's insiders sold. FINRA, Nasdaq, and the SEC have issued notices about what happens to securities with that profile: it is promoted in encrypted chat groups, bid up by retail investors instructed to buy at specified prices, and dumped. Within weeks of the PomDoctor IPO, that is what happened here. The ADSs rose 50% on no Company news, and "when promotional support ended," lost 91% of their value in a day, wiping out investments of thousands of investors.

The Registration Statement disclosed none of this. It instead warned of ordinary price volatility arising from factors such as revenues, analysts' estimates, exchange rates; identified Joseph Stone as underwriter; and cautioned that short seller "attacks" might drive the price down. But it did not warn that this combination of PomDoctor's thin public float and Joseph Stone's underwriter-specific characteristics had heightened the risk of coordinated artificial demand followed by a sharp collapse. Having chosen to speak about what would move the price of its ADSs, PomDoctor had to tell the whole truth, and its warnings omitted this one specific, heightened risk that made this security different in kind. Item 105/Item 3.D independently required a risk factor stating what made this offering speculative, and Item 303/Item 5 required disclosure of a known uncertainty that, for a company whose own prospectus tied its survival to raising more equity, went to the heart of its liquidity.

Defendants' principal argument is that a registration statement discloses facts about the issuer, not "the potential misdeeds of strangers," and that warning of third-party manipulation—a risk that "exists for every security"—would have "no limiting principle." ECF 70 ("MTD") 2. But the omitted fact is not that strangers might break the law. Rather, it is a specific, heightened risk that existed at the time of the IPO and arose from the distinctive characteristics of the securities PomDoctor designed and sold: the four percent, thin public float, priced at $4.00, placed by a single retail broker-dealer with an extensive disciplinary record and a history of problematic distribution practices. That combination—PomDoctor's own choices of float, price, and underwriter—made its ADSs particularly susceptible to being run up and dumped in a way the typical offering is not, and the risk existed at the IPO whether or not anyone had yet acted on it. An issuer with a broad float and a syndicate of established underwriters faces no such duty because it faces no such risk. That is the limiting principle.

The motion should be denied.

## II. STATEMENT OF FACTS

### A. PomDoctor Sells A 4% Float To Retail Investors Through A Single Small Broker-Dealer.

PomDoctor is a Cayman Islands holding company that operates an online medical-services platform in China. ECF 62 ("AC") ¶¶3. Its Registration Statement on Form F-1 was declared effective on September 30, 2025, and the IPO closed on October 9, 2025. AC¶¶39-40.

In that IPO, PomDoctor sold 5,000,004 ADSs at $4.00, raising $20,000,016, and placing 4.2% of its shares in public hands. AC¶¶4, 40, 44; ECF 71-1 ("Ex. 1") at cover. Defendants Shi (Chairman and CEO) and Xu (CFO), who are married, held all of the Company's super-voting Class B shares, giving Shi approximately 76% of voting power. AC¶¶8, 31-32. A public float this small can experience sharp price movements from relatively modest trading activity, so

coordinated buying by even a limited number of accounts can create the appearance of genuine demand, and once that buying stops, the same thin float magnifies the downward price movement. AC¶¶44-46.

Joseph Stone was the sole firm-commitment underwriter, bookrunner, and representative with a business focused on small-cap Chinese-based issuers. AC¶¶33, 41; Ex. 1 at 185. It purchased every ADS in the offering and controlled allocation. AC¶¶10, 41, 49. The day after the IPO closed, it exercised the full 750,000-ADS over-allotment option. AC¶40. Joseph Stone had thus sold the entire 5,750,004-ADS float—4.85% of the Company—through its own channel. AC¶¶40, 44. Joseph Stone also had its own stake in the aftermarket: by a former employee's account, in small IPOs the firm "probably owned 80% of the float," sold customers their pre-IPO shares out of its own inventory, and profited from markups and from "its own internally held shares increasing in value before being sold." AC¶¶89-90.

Joseph Stone is a small FINRA-member broker-dealer whose BrokerCheck record reveals a troubled history. AC¶¶54-55, 63. In April 2025, FINRA censured it for violating Rule 3170, the "Taping Rule" (which applies only to firms employing a high concentration of representatives from firms expelled for sales-practice abuses) finding its special supervisory procedures "not reasonably designed." AC¶¶56-59. In 2022, FINRA found that Joseph Stone had failed for five years to maintain a supervisory system reasonably designed to detect excessive trading, costing customers over $1 million. AC¶¶60-61. In addition, sixteen of its 27 brokers—***59***%—had reportable disclosure events. AC¶¶64-66.

Former Joseph Stone personnel describe how the firm distributed small IPOs. Brokers were allocated pre-IPO shares to place with customers through cold calling; customers were told they were "getting in on the ground floor," that they had to hold for at least three months, and, when

the time came, a "post-IPO target price" at which to sell. AC¶¶85-86. Brokers spoke of "supporting the stock," "creating momentum," and "holding the bid"—"keeping the price where they want it"—and senior executives ran a "program" with a "pre-agreed time to sell." AC¶¶87-88. Customer accounts were commonly concentrated in a single issuer, and while customers were told not to sell, "the insiders at Joseph Stone sold at a profit." AC¶¶89-90. Account-opening rules were bent, and pitch scripts FINRA did not permit were shredded before examinations. AC¶¶91-92. A former senior vice president said Joseph Stone "likes pump-and-dump schemes," and a former adviser described it as "definitely not" the only boutique brokerage that "floated a small number of shares in the market, set the share price at $4 or $5, and then 'manipulates' the price." AC¶¶80, 93. None of this appeared on BrokerCheck. AC¶¶97-98.

### B. The Registration Statement Warned Of Generic Volatility, Not The Offering-Specific Risk.

The Registration Statement's risk factors on the ADSs, under the caption "Risks Related to Our ADSs and This Offering," warned that the price "is likely to be volatile" because of "broad market and industry factors" and fifteen "factors specific to our own operations"—revenues, operating metrics, analyst estimates, exchange rates, and the like—and that "[t]echniques employed by short sellers may drive down the market price of the ADSs." AC¶111; Ex. 1 at 62-64. They did not disclose the risk that a 4% float sold through Joseph Stone's retail distribution model was susceptible to coordinated promotion and collapse. AC¶¶13-15, 52, 103. The words "thinly traded" and "manipulation" appear nowhere in the prospectus, and nothing in it describes the float as small, limited, or thin.

The Registration Statement identified Joseph Stone as the underwriter and disclosed its compensation (AC¶¶13, 41), noting it is a "full service financial institutions engaged in ... investment banking, financial advisory, investment management, [and] investment research,"

Ex. 1 at 188, and instructed investors that they "must not rely on any unauthorized information or representations" outside the prospectus. AC¶48; Ex. 1 at i. Cogency Global was identified as PomDoctor's "agent for service of process in the United States." AC¶¶34, 37; Ex. 1 at 18, 79.

### C. The Omitted Risk Materializes.

After the IPO, scammers solicited retail investors through WhatsApp, WeChat, and other platforms, instructing them to place buy limit orders of PomDoctor ADSs at specified prices. AC¶¶17, 119-24. The ADSs rose more than 50% above the IPO price on no Company-specific news, closing at $5.42 on December 9, 2025. AC¶¶18, 118, 126. Overnight, the price fell approximately 91%, to roughly $0.50. AC¶¶18, 127.

## III. ARGUMENT

Securities Act claims are subject only to the "short and plain statement" requirements of Fed. R. Civ. P. 8(a). *Litwin v. Blackstone Grp.*, 634 F.3d 706, 715 (2d Cir. 2011),[1] and "place[s] a relatively minimal burden on a plaintiff," *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) ("*Panther II*"). Plaintiffs "need not allege scienter, reliance, or loss causation"; issuers face "virtually absolute" liability, and the remaining defendants "may be held liable for mere negligence." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010); *Winter v. Stronghold Digit. Mining, Inc.*, 686 F. Supp. 3d 295, 304-05 (S.D.N.Y. 2023) (Abrams, J.).

The AC pleads three independent theories of liability. *First*, having chosen to warn investors about aftermarket volatility, PomDoctor had to tell the whole truth, and its warnings omitted the offering-specific risk that made the warned-of volatility different in kind. *Infra* § III.A.

[1] Rule 8 governs, as explained in the accompanying opposition to Joseph Stone Capital, LLC's Motion to Dismiss, ("JSC Opp.") § III.B.

*Second*, Item 105 of Regulation S-K and Item 3.D of Form 20-F required a discussion of the factors that made this offering speculative, and the Registration Statement omitted the one that mattered. *Infra* § III.B. *Third*, Item 303 of Regulation S-K and Item 5 of Form 20-F independently required disclosure of a known uncertainty reasonably likely to affect liquidity and capital resources, and for an issuer whose survival depended on raising more equity, that risk was such an uncertainty. *Infra* § III.C.

**A. The Registration Statement's Risk Warnings Were Misleadingly Incomplete.**

**1) Having Spoken On The Aftermarket Volatility Risk, PomDoctor Had To Tell The Whole Truth.**

"'[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth,'" and that "obligation is triggered once a defendant puts the topic 'in play,' based on 'an examination of defendants' representations, taken together and in context.'" *Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324, at *7 (S.D.N.Y. Sep. 13, 2024) (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)).[2] "Literally true" statements or "'half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations.'" *Sills*, 2024 WL 4188324, at *7.

PomDoctor put the aftermarket for its ADSs "in play." The AC challenges the Registration Statement's "risk disclosures concerning volatility, trading, liquidity, market risk, and investor losses," AC¶117; Ex. 1 at 62-64. One risk factor warned that the trading price "is likely to be volatile and could fluctuate widely due to factors beyond our control" because of "broad market and industry factors." It then listed fifteen "factors specific to our own operations"—revenues,

[2] The Commission's rules say the same: a registration statement must include "such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made, not misleading." 17 C.F.R. § 230.408(a); *see In re Didi Glob. Inc. Sec. Litig.*, 2024 WL 1119483, at *10 (S.D.N.Y. Mar. 14, 2024).

operating metrics, analysts' estimates, exchange rates, and the like—before adding that "[a]ny of these factors may result in large and sudden changes in the volume and price at which the ADSs will trade" and that "the stock market in general experiences price and volume fluctuations that are often unrelated or disproportionate to the operating performance of companies like us." AC¶111; Ex. 1 at 62. A second risk factor warned of short-seller "attacks" that "may drive down the market price of the ADSs" and "create negative market momentum," but assured investors that PomDoctor had "not been the subject of short selling." Ex. 1 at 63-64; *see supra* § II.B.

Having chosen to speak about what would drive the trading price of the ADSs—and having catalogued fifteen operational and macroeconomic reasons the price might move and one form of third-party manipulation—PomDoctor could not omit the risk that made the warned-of volatility different in kind from the one it described: that a 4% float, priced at $4.00 and sold entirely through a single retail broker-dealer, was particularly susceptible to artificial inflation and to collapse once the artificial demand ended. AC¶¶112-15; *see infra* § III.B.1. "Generic warnings will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability," *Didi*, 2024 WL 1119483, at *8 (quoting *Meyer*, 761 F.3d at 251), and a boilerplate list of reasons any stock might move "do[es] not accurately represent Defendants' assessment of the risks" when, as here, Defendants "were aware of singularly prohibitive risks associated with" this offering in particular, *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646-47 (S.D.N.Y. 2012) (generic risk disclosures materially misleading).

Similarly, in *Sills* the court held that risk factors were misleadingly incomplete where they "put in play the sensitivity of the Company's margins to deflationary and inflationary pressures, as well as the risk of decreased opportunities for promotion-related forward buying" but "did not mention the separate risk of decreased opportunities for inflation-related forward buying." *Sills*,

2024 WL 4188324, at *9. Here, too, the Registration Statement put in play the factors that could produce "large and sudden changes in the volume and price at which the ADSs will trade," including fluctuations "unrelated or disproportionate to" the Company's "operating performance," Ex. 1 at 62, but "did not mention the separate risk" of the offering-specific susceptibility to manipulation, *Sills*, 2024 WL 4188324, at *9. "[T]he amorphous discussion of a generic risk cannot insulate an issuer from liability when it fails to disclose a *specific* known risk," and disclosures that warn "only of the general risk" are "not sufficiently specific to support [the] claim that no reasonable investor could have found [the omitted risk] well worth knowing." *Didi*, 2024 WL 1119483, at *8 (generic regulatory risk misleadingly incomplete). "By circling that issue 'but omitting the negative elephant in the room,' the Risk Factor Statements were plausibly misleading." *Sills*, 2024 WL 4188324, at *9.

Moreover, that the Registration Statement chose to warn of one form of third-party price manipulation—short-seller "attacks"—while omitting the other "supports the conclusion that such omission was plausibly misleading." *Sills*, 2024 WL 4188324, at *9. ("That this separate forward buying risk was disclosed—but inflation-related forward buying was not—supports the conclusion that such omission was plausibly misleading."). That is particularly so where, as the AC pleads, PomDoctor's structure and choice of broker made coordinated manipulation "the bigger risk" to the price of its ADSs. *Id.*

*Barilli* and *Xinhua* (MTD 24) do not change the analysis. Those decisions hold that a statement on one subject does not require disclosure of uncharged past misconduct on another. *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 251-52 (S.D.N.Y. 2019). The omitted fact here is not Joseph Stone's disciplinary history but a material, heightened risk on the very subject the risk factor addressed—what would move the trading price of the ADSs—and Joseph Stone's

record and distribution practices are among the specific facts that made that risk real. AC¶¶14, 112-15. Where an issuer chooses to speak about the drivers of its trading price, an omitted risk to that same trading price is not a "different subject"; it is the missing part of the same one. *Cf. Lian v. Tuya Inc.*, 2025 WL 733253, at *8 (S.D.N.Y. Mar. 7, 2025) ("*Lian II*") (asking whether the omitted information is "substantially similar" to the subject of the challenged statement).

The risk disclosures therefore "did not capture the presently increased likelihood of the risk" of this manipulation, rendering them misleadingly "[in]complete." *Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd.*, 799 F. Supp. 3d 310, 348 (S.D.N.Y. 2025); *Bruder v. Plug Power Inc.*, 2026 WL 2905418, at *14 (N.D.N.Y. Sep. 28, 2026) ("Defendants … acknowled[ed] that its 'access to key raw materials' was reduced without providing an accurate explanation as to why …."). A prospectus that described ordinary volatility and short-seller attacks while omitting the offering-specific risk misled investors "about the nature of the risk when he invested." *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002); *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, 2025 WL 416872, at *8 (E.D.N.Y. Feb. 6, 2025) (risk factors omitted "specific information" about a known regulatory directive).[3]

**2) The Registration Statement Did Not Disclose The Risk.**

Defendants argue that the Registration Statement "provided extensive, specific warnings about the very risks Plaintiffs claim were concealed." MTD 2, 15-18. That ignores that cautionary language "must be … specific, and must directly address exactly the risk that plaintiffs claim was not disclosed." *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 303 (S.D.N.Y. 2013) ("[A] district

[3] In *Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574 (S.D.N.Y. 2022) (MTD 9, 25), and *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385 (S.D.N.Y. 2022) (MTD 23) each prospectus warned of the specific risk that materialized.

court must pay close attention to the question of whether the language provided matches the risk addressed.").

Measured against that standard, the Registration Statement disclosed nothing about the specific risk alleged: not one of the fifteen factors in the volatility risk factor concerns the size of the float, the manner of distribution, the underwriter, or coordinated buying. Ex. 1 at 62. That the Registration Statement warned about the ADS price "mov[ing] sharply in both directions for reasons unrelated to PomDoctor's operating performance" (MTD 22), as shown, is such "generic risk disclosure[] … inadequate to shield defendants from liability for failing to disclose known specific risks," *In re Am. Int'l Grp. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010); *Panther II*, 681 F.3d at 120-22 (generic warning that products might contain defects "did not fulfill … duty to inform the investing public of the particular, factually-based uncertainties of which [issuer] was aware"); *Hunt v. All. N. Am. Gov't Income Tr.*, 159 F.3d 723, 729 (2d Cir. 1998) (reversing dismissal; cautionary language "warned investors of a different contingency than that which plaintiffs allege was misrepresented").[4]

Defendants argue that the Registration Statement "disclosed each of the structural features—the small public float, the absence of any prior trading market, PomDoctor's status as a newly listed China-based issuer, insiders' concentrated voting control, and Joseph Stone's role in the IPO—that Plaintiffs claim was concealed." MTD 23, 15-17. Defendants' assertion that the prospectus "told investors that the public float was small" (MTD 2) overstates what it said. *Supra* § II.B. Share counts and a percentage scattered across a cover page, a capitalization table, a dilution table, and a lock-up section are not a warning, and a reasonable investor is not charged with reconstructing an undisclosed risk from data buried in a 250-page prospectus. *See United*

[4] In *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 98-104 (2d Cir. 2013), and *Olkey v. Hyperion 1999 Term Tr.*, 98 F.3d 2, 5-9 (2d Cir. 1996), the offering documents warned of the very risk said to be concealed.

*Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199-1200 (2d Cir. 1993); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 453 n.11 (S.D.N.Y. 2005) ("An investor should not be called upon to piece together buried information"). The disclosures that the IPO price was "arbitrarily determined" and that an active market "might not develop" (MTD 3, 17) warned that the ADSs might trade *below* $4.00 for want of interest—not of a 50% rise on no news followed by a 91% collapse in a day.

More fundamentally, the argument confuses the facts that created the risk with the risk itself. The AC does not allege that PomDoctor hid those facts; it alleges that PomDoctor never disclosed what they meant in combination for the securities it was selling—that they made the ADSs particularly susceptible to coordinated inflation and collapse. AC¶¶14-15, 112-15. A prospectus that states every premise and omits the conclusion is the paradigm of a half-truth. *See Sills*, 2024 WL 4188324, at *9 (risk factors that "circl[ed]" the subject "but omit[ted] the negative elephant in the room" were plausibly misleading). *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (MTD 22-23), asks only whether the representations, "taken together and in context, would have misled a reasonable investor"—a test that warning of ordinary volatility and downward "attacks," while saying nothing of the offering-specific risk, fails when read "together and in context." Nor was "Joseph Stone's role in the IPO" disclosed (MTD 23) in any meaningful sense; the prospectus described Joseph Stone as a "full service financial institution[]," Ex. 1 at 185, 188, a description that reassures rather than warns. *Supra* § II.B.

Nor does the AC ask that PomDoctor "advertise with self-incriminating candor" (MTD 2, 21) or to "kneecap itself" (MTD 25 (quoting *Lian II*, 2025 WL 733253, at *1, *11)).[5] The AC does not ask PomDoctor to accuse anyone of ongoing misconduct. The omitted fact is a risk that existed,

[5] *Lian II* is further afield. The omitted facts there were the undetected, "unadjudicated misconduct" of the issuer's customers, conduct into which an issuer "generally lacks special insight." 2025 WL 733253, at *1, *11.

and was disclosable, whether or not anyone had yet acted on it. AC¶¶14-15, 112-15. Describing a risk that regulators had already published is not a "rite of confession," *ProShares*, 728 F.3d at 103 (MTD 24); it is the disclosure Section 11 requires.

### B. The Registration Statement Omitted A Risk Factor That Item 105/3.D Required.

#### 1) Item 105 Reaches Risks Specific To "The Offering," Which The Registration Statement Failed To Include.

Even absent a misleading statement, Defendants are liable under Item 105, which requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky," and directs the registrant to "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105(a)-(b). Item 3.D of Form 20-F likewise requires "risk factors that are specific to the company or its industry and make an offering speculative or one of high risk."

The Registration Statement did not meet that requirement. As shown above, its risk factors said nothing about the factor that made this offering speculative: the susceptibility of the ADSs, as structured and distributed, to artificial inflation and collapse. *Supra* §§ II.B, III.A.2; Ex. 1 at 62-64; AC¶¶15, 44-52, 103-05, 111-15.

In *Cloopen*, Judge Koeltl sustained an Item 105 claim where general risk disclosures about the issuer's warrant liabilities "left investors without the information they needed ... to evaluate its impact on the riskiness of the investment." *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 232 (S.D.N.Y. 2023). Here, whatever else the Registration Statement said about volatility, it left investors without the information they needed to evaluate the riskiness of the ADSs they were buying. AC¶¶14-15, 44-52, 103-05. An investor who read every risk factor in the prospectus could not have evaluated that risk, because the prospectus never identified it as a risk at all. *Accord Didi*, 2024 WL 1119483, at *8-10 (risk factors failed to disclose "specific risk" at issue); *In re Hub*

*Cyber Sec. Ltd.*, 2025 WL 872078, at *17 (S.D.N.Y. Mar. 20, 2025) (Item 105 claim stated; "none of those purported risk disclosures identifies the fundamental 'risk' at issue"); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426-27 (S.D.N.Y. 2011) (Item 105 claim upheld; ventures were "speculative in a way not identified by the disclosure"); *see infra* § III.C.2. PomDoctor's volatility warning is the "generic disclosure" the rule "discourages." *See Panther II*, 681 F.3d at 120-22 (a "generic" risk factor "did not fulfill Ikanos's duty to inform the investing public of the particular, factually-based uncertainties of which it was aware"); *EnergySolutions*, 814 F. Supp. 2d at 426-27. In any event, as discussed *supra* § III.A, the AC plausibly alleges that PomDoctor's "risk warnings regarding [price volatility] were themselves misleading," and "[t]hus, the Complaint sufficiently pleads a violation of Item 105" on that ground as well. *Cloopen*, 661 F. Supp. 3d at 232.

Defendants' main contention is that "[a] registration statement exists to disclose information about the issuer, not its underwriter or the potential misdeeds of strangers." MTD 2, 10-11, 21 (citing *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 688 (S.D.N.Y. 2004)). But Item 105's text is not confined to the issuer and its operations; it reaches the factors that "make an investment in the registrant ***or offering*** speculative or risky" and how each risk affects "the registrant ***or the securities being offered***." Indeed, the risk-factor disclosure "was initially called for only in the offering context," and was extended to periodic reports only in 2005. 84 Fed. Reg. at 12688. *See also In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 296, 311-12 (S.D.N.Y. 2003) ("*In re IPO*") (registration statements omitting underwriters' aftermarket "tie-in" arrangements). Moreover, the Commission's prior guidance gave as one of five example disclosures "[t]he lack of a market for your common equity securities," 17 C.F.R. § 229.503(c)(5)

(2019)—a risk that concerns the securities being offered, not the issuer's business.[6] A registration statement that must warn of the absence of a market for the securities must, by the same token, warn of a market that the offering's own structure made susceptible to manipulation.

Nor do Items 401(f) and 9 (MTD 11 n.4, 12-13) narrow Item 105. Those items require that particular facts be stated—the disciplinary history of directors and officers, and the underwriter's identity and the terms of the underwriting—while Item 105 asks what makes this offering speculative or risky. Plaintiffs do not allege that Joseph Stone's disciplinary history had to be recited as a freestanding fact; they allege the Registration Statement had to disclose the risk that the offering's float, price, and distribution created, to which Joseph Stone's record and practices contributed. Facts about an underwriter "can constitute material omissions, even where no regulation expressly compels the disclosure." *WorldCom*, 346 F. Supp. 2d at 688-89.

Defendants contend Plaintiffs "plead no facts connecting [Joseph Stone's] historical disciplinary record to PomDoctor's business, disclosures, or any known plan or practice to manipulate PomDoctor's ADSs." MTD 13. The AC ties Joseph Stone's record not to PomDoctor's "business" in the abstract, but to the distribution of PomDoctor's securities, pleading that Joseph Stone bought the entire float, controlled its distribution, had engaged in unethical practices in promoting small-cap Chinese companies, and had been sanctioned for supervisory failures in the very functions—allocation, customer communication, and the detection of concentrated or coordinated buying—that stand between a 4% float and a coordinated run-up. AC¶¶10, 49-52, 56-61, 85-89, 103(b)-(c), 112(b)-(c), 114.

---

[6] The Commission deleted the examples in 2019 as "inconsistent with the Commission's emphasis on principles-based requirements," not because any of them fell outside the item. FAST Act Modernization and Simplification of Regulation S-K, Securities Act Release No. 33-10618, 84 Fed. Reg. 12674, 12689 (Apr. 2, 2019).

**2) The Omitted Risk Was Specific To This Offering, Not Generic To Every Security.**

Defendants try to disclaim the need for this warning given "[t]he possibility of third-party manipulation … exists in every offering, for every issuer, and disclosing it would have told investors nothing about PomDoctor specifically." MTD 11-12. Not so.

PomDoctor's offering had traits heightening the risk of manipulation that are not present in the typical issuer. The base offering placed 833,334 ordinary shares—4.2% of the Company—in public hands. AC¶44. The ADSs were priced at $4.00 and sold entirely through a single retail broker-dealer that bought and allocated every one of them and placed small China-based IPOs with retail customers through cold calling, holding instructions, and "post-IPO target price[s]." AC¶¶10, 40-41, 49, 85-89. Six months before the IPO, FINRA had censured that broker-dealer for supervisory failures implicating the functions through which a float this size is promoted and dumped, and 59% of its brokers had reportable disclosure events. AC¶¶14, 52, 56-61, 64-66. The issuer was a newly listed China-based company with no prior U.S. trading market, a going-concern qualification, and insiders holding 76% of the voting power. AC¶¶8, 31-32, 103(a), 115; Ex. 1 at 25. Floats this small are rare: fewer than a third of the companies that went public in 2025 had a public float below even 30% of their shares, and FTSE Russell will not admit a company with less than 5% of its shares available in the market to any Russell U.S. index. The typical IPO is also sold through a syndicate of several underwriters, not one firm.[7] An issuer with a broad float and a

[7] Phil Mackintosh & Nicole Torskiy, *Most Index Stock Floats Are Over 80%*, Nasdaq Index Rsch. & Insights (Nov. 6, 2025). FTSE Russell removes from eligibility for its U.S. indexes "[c]ompanies with less than an absolute 5% of shares available." FTSE Russell, *Russell US Equity Indexes: Construction and Methodology* § 5.10.1 (v7.2, Aug. 2026). The mean number of managing underwriters per U.S. IPO rose from 2.3 in 1995 to 4.8 in 2005. Wendy Y. Hu & Jay R. Ritter, Multiple Bookrunners in IPOs 37 tbl. I (Dec. 6, 2007), https://site.warrington.ufl.edu/ritter/files/2015/06/Multiple-Bookrunners-in-IPOs-2007-12-06.pdf.

syndicate of established underwriters faces no such duty because it faces no such risk. These facts supply the "limiting principle" Defendants say does not exist. MTD 2.[8]

The SEC itself has noted that of the 151 China-based issuers that listed on Nasdaq through an IPO between August 2022 and April 2025, 143 raised less than $25 million, and that Nasdaq's referrals of suspected manipulation rose from ten in 2022 to 91 in 2025, about 70% of them involving Chinese companies, which make up less than 10% of Nasdaq's listings. Exchange Act Release No. 34-105494, at *6, *15 (May 14, 2026). Indeed, nearly three years before the IPO, FINRA alerted every member firm to "pump-and-dump-like schemes" targeting small-cap IPOs, identifying the precise pattern: offerings that "raised less than $25 million"; issuers with "primary operations in China"; allocations "leading to a concentration of shares being held in very few hands"; investors directed "to place limit orders in certain securities at a specific time and price"; and price spikes followed by declines "to a level at or below the offering price." FINRA Regulatory Notice 22-25 (Nov. 17, 2022). On September 3, 2025, a month before the IPO, Nasdaq proposed a $25 million minimum offering for China-based issuers, citing "emerging patterns associated with potential pump-and-dump schemes," Press Release, Nasdaq, Inc., Nasdaq Proposes Changes to its Listing Standards (Sep. 3, 2025), and explained that "[l]ess liquid securities also may be more susceptible to price manipulation, as a relatively small amount of trading activity can have an inordinate effect on market prices," Exchange Act Release No. 34-103979, 90 Fed. Reg. 45298, 45302 (Sep. 19, 2025). A risk that regulators could describe with that precision is not one that "exists for every security." MTD 2.[9]

---

[8] In *Morgan Stanley* (MTD 12) the risk that research "may be biased or flawed" was one "all investors" face and had "nothing to do with a specific fund." 592 F.3d at 363-64.

[9] The Court may take judicial notice of these regulatory notices, rule filings, and orders for the fact of their issuance and content, not for their truth. *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008). Plaintiffs cite them to rebut Defendants' legal contention that the omitted risk was "generic" and unforeseeable.

The distributor is part of the same profile. These offerings are brought by a small circle of boutique broker-dealers—a January 2026 analysis found that eight underwriters had handled about three-quarters of the Nasdaq Capital Market IPOs that were promoted in encrypted chat groups and then collapsed—and the AC pleads that Joseph Stone is one of them. AC¶¶12, 79-83, 93.[10] Nasdaq's December 2025 listing rule likewise treats "the involvement of similar advisors" as a marker of a security's susceptibility to manipulation. Exchange Act Release No. 34-104464, 90 Fed. Reg. 60829, 60831 (Dec. 29, 2025). An offering PomDoctor chose to sell through one of those underwriters is not one in which the risk arrives through "unaffiliated strangers." MTD 14.

In any event, Item 105 reaches only the "material factors" that make an investment speculative or risky, 17 C.F.R. § 229.105(a), and "courts typically analyze the sufficiency of Item [105] disclosures with the familiar [Section 11] materiality standard," *EnergySolutions*, 814 F. Supp. 2d at 426. "These requirements provide sufficient protection against the opening-of-the-floodgates argument advanced" by Defendants. *Litwin*, 634 F.3d at 722–23 (materiality "is still capable of some defined boundaries").[11] *Infra* § III.D.

Defendants' contention that a risk not reasonably likely to be material under Item 303 cannot be an Item 105 risk (MTD 20) fails because the items ask different questions. Item 303 asks whether a known trend or uncertainty is reasonably likely to affect the issuer's financial condition or results of operations; Item 105 asks what makes an investment in the offering speculative or

[10] Weihua Li et al., *Wall Street's Stamp of Legitimacy Fuels Suspected Pump-and-Dump Schemes*, Bloomberg (Jan. 29, 2026).

[11] As to Item 105, no Second Circuit decision imposes an "actual knowledge" element; *Gutman v. Lizhi Inc.*, 633 F. Supp. 3d 681, 690 (E.D.N.Y. 2022)—Defendants' own authority (MTD 15)—and *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *10 (S.D.N.Y. Sep. 27, 2020), hold that Item 105 does not require one; and even the district courts that read a knowledge requirement into Item 105 require only that the issuer know "of the relevant risk factor," not that any particular adverse event will occur. *Lian v. Tuya Inc.*, 2024 WL 966263, at *9 (S.D.N.Y. Mar. 5, 2024) ("*Lian I*"); *Hub*, 2025 WL 872078, at *17; *Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022). *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016), *Blackmoss Invs. Inc. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617 (S.D.N.Y. Jan. 14, 2010), and *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289 (S.D.N.Y. 2020) (MTD 18), address Item 303 only; none meaningfully construes Item 105.

risky, including how a risk "affects … the securities being offered." 17 C.F.R. § 229.105(a)-(b). A risk to the integrity of the trading price of the very securities being sold makes an offering speculative whether or not it would also move the issuer's revenues, so the Item 105 claim stands on its own.

### C. The Registration Statement Omitted A Known Uncertainty Under Item 303/Item 5.

#### 1) The AC Pleads The Required Nexus To Liquidity And Capital Resources.

Item 5 of Form 20-F, like Item 303, requires disclosure of known uncertainties "reasonably likely to have a material effect" on "liquidity or capital resources." MTD 9.

Far from being "conclusory" (MTD 20), the AC pleads that PomDoctor's "liquidity and capital resources depended on its ability to access and maintain credibility in the U.S. public markets"; and that the undisclosed risk "was reasonably likely to materially affect PomDoctor's liquidity, capital resources, access to financing, ability to use its publicly traded ADSs as consideration or compensation, and ability to maintain investor confidence." AC¶¶16, 109; *see* AC¶¶106-08. That states a claim. *See Panther II*, 681 F.3d at 120-22 (Item 303 claim stated where the issuer knew of a defect-related uncertainty, though not yet its magnitude); *Litwin*, 634 F.3d at 716-19; *Orient Plus*, 799 F. Supp. 3d at 346-47 (Item 303 claim stated against China-based issuer and its underwriters where an undisclosed investigation was "reasonably likely" to have a material effect, "even if [the issuer] could not predict with certainty the outcome"); *Cloopen*, 661 F. Supp. 3d at 231-32; *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 507-16 (S.D.N.Y. 2013).

The Prospectus also disclosed that PomDoctor's auditor had expressed "substantial doubt about [its] ability to continue as a going concern," that the Company held US$1.0 million in cash against US$24.5 million in current liabilities, and that "[a] 'going concern' opinion could impair

our ability to finance our operations through the sale of equity" and remaining in business depended on "obtain[ing] additional working capital funds through debt and equity financings." Ex. 1 at 25, 95. For an issuer whose survival depended on selling more equity, a risk that its only public equity market would be artificially inflated and then collapse was a risk to its liquidity and capital resources. *See Didi*, 2024 WL 1119483, at *10 (Item 303 nexus adequately pleaded where the issuer's own "risk disclosures acknowledged" that the undisclosed contingency would materially affect its business).

Nor must the issuer know how the uncertainty will resolve: an issuer "uncertain about [the] likely effect" of a known risk is "still required under Item 303 to disclose the manner in which [it] might reasonably be expected to materially impact" the company, *Orient Plus*, 799 F. Supp. 3d at 346 (quoting *SAIC*, 818 F.3d at 96), and "generalized and indefinite terms" do not discharge that duty, *Facebook*, 986 F. Supp. 2d at 511, 513; *Cloopen*, 661 F. Supp. 3d at 231 n.7.[12] PomDoctor could not know when or by whom the susceptibility of its float would be exploited, but it knew the uncertainty, and folding it into a warning that the ADS price "is likely to be volatile" did not disclose "the manner in which" it "might reasonably be expected to materially impact" a company whose survival depended on raising more equity. Ex. 1 at 25, 62, 95.

**2) The Omitted Risk Was Known And Knowable Before The IPO.**

Defendants' "actual knowledge" argument—that the claims "fail because [Plaintiffs] have not sufficiently pleaded that PomDoctor, Mr. Shi, or Ms. Xu had actual knowledge of an omission under Items 5 or 3(D)" (MTD 18-19)—misstates both the law and the facts.

[12] Defendants' cases (MTD 14, 20) are Section 10(b) decisions or business-trend cases in which the plaintiffs failed to allege "any negative financial impact at all." *Shetty v. Trivago N.V.*, 796 F. App'x 31, 33-34 (2d Cir. 2019). *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 469 (E.D.N.Y. 2020), concerned a chief executive's personal misconduct that "was not 'extrinsic' or about the firm's 'operational situation.'" Neither involved an issuer whose prospectus tied its survival to the market for the securities at issue.

As this Court has held, "'knowledge is not an element' of a plaintiff's prima facie case for Section 11 … claims." *Winter*, 686 F. Supp. 3d at 306-07. Indeed, Section 11 requires only that the omitted fact "be knowable." *Lian I*, 2024 WL 966263, at *11; *Hub*, 2025 WL 872078, at *15 (facts "knowable" where, "if defendants looked, they would have found them"); *Lian II*, 2025 WL 733253, at *4 n.3 (Section 11, "as a strict liability statute, does not require a plaintiff to allege that an issuer had actual knowledge of the facts it failed to disclose"). While Item 303 requires that the underlying "trend or uncertainty" be "presently known to management," *Litwin*, 634 F.3d at 716, the Second Circuit has made clear that what must be known is the "uncertainty"—not its magnitude or its outcome, *Panther II*, 681 F.3d at 121 (issuer required to disclose the "uncertainty" it knew of although "the precise 25-30% chip failure rate" was not "determined until after" the offering).

Here, every fact pleaded in the AC that made the offering susceptible was known at the time of the offering. PomDoctor and the Individual Defendants "knew the Offering's structure, including the small ADS float being sold to the public," chose to sell it through Joseph Stone, and knew that its liquidity depended on the U.S. public markets. AC¶¶16, 35, 44. An issuer that hires a broker-dealer to sell its shares to retail investors cannot disclaim what that firm's public regulatory record would have shown had it "looked." *Hub*, 2025 WL 872078, at *15; *see Cloopen*, 661 F. Supp. 3d at 226-29 (treating facts "available to" the issuer before its IPO as facts it was required to disclose). Nor does it matter that none of the former Joseph Stone employees worked on PomDoctor's IPO (MTD 19). The AC does not offer their accounts to show PomDoctor's actual knowledge but to plead how PomDoctor's chosen underwriter distributes small China-based IPOs, and "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). The accounts span 2020 through July 2025—by which time Joseph Stone had

been engaged for this offering—and a compliance principal at Joseph Stone's clearing firm describes the firm through October 2025. AC¶¶78, 81, 85, 93-96; PomDoctor Limited, Registration Statement (Form F-1/A) (June 17, 2025);[13] *see* JSC Opp. § III.E. Defendants also insist that "[a] company cannot 'know' of a scheme that does not yet exist" (MTD 3), but the omitted fact is the susceptibility of the ADSs as structured and distributed, which existed, and was known, on September 30, 2025. *Panther II*, 681 F.3d at 121.[14]

For the same reason, the "hindsight" charge (MTD 14) fails. Nothing here required prediction: the float, the price, the underwriter, its record, and its business model were all in place before effectiveness. *See Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021) (rejecting a "fraud-by-hindsight" characterization where "publicly accessible information" bearing on the risk "was available to the defendants prior to" the challenged statement). Indeed, Defendants cite *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 669, 672 (S.D.N.Y. 2008), but the Second Circuit later held, as to the same offering and risk factor, that the district court had "construed the proposed complaint ... too narrowly" by demanding knowledge of the outcome rather than of the uncertainty, *Panther II*, 681 F.3d at 120-22. "Courts often reject an incantation of fraud-by-hindsight when plaintiffs allege that the company failed to take into account information that was available to it at the time that the company issued the incorrect statements or omissions." *Salix*, 2016 WL 1629341, at *17. That is this case: three years of

---

[13] https://www.sec.gov/Archives/edgar/data/1877971/000121390025054956/ea0200019-14.htm.

[14] *Lian I* (MTD 19) is not to the contrary. The public reports there described "broader trends in the e-commerce industry" and could not support an inference that the issuer knew "a much more specific" fact—that its own customers were buying fake reviews. *Lian I*, 2024 WL 966263, at *8. The notices here are not industry background from which some narrower, undisclosed fact must be inferred; they describe the offering profile PomDoctor chose and the omitted fact is the susceptibility of that profile.

regulatory warnings about exactly this combination of features, and FINRA's censure of PomDoctor's own underwriter, all predated effectiveness. *Supra* § III.B.2; AC¶¶50-66.[15]

**D. The AC Pleads the Omission Was Material, Which Cannot Be Resolved On This Motion.**

"To allege a material misrepresentation at the pleading stage, the plaintiff need only offer sufficient evidence of 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'" *Sills*, 2024 WL 4188324, at *7–8 (quoting *Litwin*, 634 F.3d at 716–17). "[A] complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Winter*, 686 F. Supp. 3d at 309. "Where the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower" than the "relatively minimal burden" applicable to other elements under Rule 8. *Litwin*, 634 F.3d at 718.

This is not such a case. The AC pleads the omitted facts "altered the total mix of information available to investors because they showed that PomDoctor's ADSs were not merely subject to ordinary volatility, but were particularly susceptible to the kind of coordinated promotion, artificial inflation, and collapse that occurred," AC¶115, and were "material because they bore directly on the underwriting, distribution, customer-communication, allocation, account-opening, clearing, and supervisory functions that made PomDoctor's low-float ADSs susceptible to artificial price inflation," AC¶98; *see* AC¶¶14-16, 44-46, 52, 90, 113. Facts bearing on whether the market price of a newly offered security will reflect genuine demand go to the heart of an investment decision, particularly for an issuer whose survival depended on raising additional

[15] *Gutman* and *Wandel* dismissed claims that January 2020 registration statements should have predicted a global pandemic—a risk "neither known nor knowable" when the offerings closed. *Wandel*, 590 F. Supp. 3d at 641, 646-47.

equity. Ex. 1 at 25. Moreover, the practices of the firm distributing the float are what made the risk acute rather than theoretical. *Supra* § II.A; AC¶¶10, 41, 49, 56-61, 85-89; *see In re IPO*, 241 F. Supp. 2d at 296; *see also Orient Plus*, 799 F. Supp. 3d at 349-50. And Joseph Stone had its own stake in the aftermarket it was supposed to police. AC¶¶85-90.

Defendants claim that "every fact about Joseph Stone that Plaintiffs claim was omitted was already in the public domain" on BrokerCheck. MTD 3, 25-26. BrokerCheck says nothing about PomDoctor, its float, or how its ADSs would be distributed; what it disclosed was raw material for one input into the risk, and even that required reviewing approximately 189 individual records and verifying each broker's association with the firm. AC¶¶66, 69-73. *Garnett* and *Rubinstein* (MTD 25; ECF 74 at 16), which turned on omitted facts that were themselves public, therefore do not apply. AC¶¶69-76, 97-98. In any event, this contention is a truth-on-the-market defense, which "is intensely fact-specific and is rarely an appropriate basis for dismissing" a complaint, and to prevail, defendants must show that the corrective information was conveyed "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." *Ganino*, 228 F.3d at 167. Documents filed with a regulator but not distributed to investors "should rarely be considered part of the total mix of information," and shareholders are not required to comb through them. *United Paperworkers*, 985 F.2d at 1199-1200; *see Facebook*, 986 F. Supp. 2d at 521-22 (where the prospectus instructed investors to rely only on the prospectus, a reasonable investor "will not be charged" with knowledge of outside reports). PomDoctor's prospectus contained exactly that instruction. AC¶48; Ex. 1 at i.[16]

[16] Defendants' "public domain" cases (MTD 25; ECF 74 at 15-16) involved information that had saturated the national press for years, *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003), or newspaper articles, published weeks before the IPO, that reported the very fact alleged to have been concealed, *In re Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *6 (S.D.N.Y. Sep. 27, 2019).

In addition, "[a] major factor in determining whether information was material is the importance attached to it by those who knew about it.'" *Facebook*, 986 F. Supp. 2d at 520. Three years of regulatory notices, rules, and enforcement actions directed at precisely this risk show the importance that FINRA, Nasdaq, and the SEC attached to it. *See MF Glob.*, 982 F. Supp. 2d at 317 (regulators' contemporaneous reaction to the undisclosed exposure "buttress[ed] a reasonable inference" of materiality).[17]

**E. Negative Causation Is An Affirmative Defense That Cannot Be Resolved On The Pleadings.**

"[U]nder section[] 11 … [plaintiffs] need not allege ... loss causation." *Winter*, 686 F. Supp. 3d at 310. "The absence of loss causation—known as 'negative causation'—is instead an affirmative defense' that defendants bear the burden of proving, reflecting Congress's desire to allocate the risk of uncertainty to the defendants." *Id*. "That burden is a heavy one, and is generally established by a defendant on a motion for summary judgment or at trial." *Id*.

Defendants claim that the price "collapsed when promotional support ended," which they call "an intervening act of third parties." MTD 3, 26-27. But the collapse of an artificially inflated price when the artificial buying stops is not an event intervening between the omission and the loss; it *is* the materialization of the omitted risk. *Orient Plus* rejected the same argument, reasoning that the disclosures "disguised the very risk to which plaintiff fell victim." 799 F. Supp. 3d at 352-53. A defendant is liable where "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d

[17] Nor did the regulators' notices and rule filings make the risk "public" in a way that defeats materiality. The notices were addressed to member firms, listing applicants, and the Commission's rulemaking docket, not to PomDoctor's investors, and the notices described a category of offerings, not PomDoctor's. Thus, an investor could not have known that PomDoctor's offering fit the category without the facts the prospectus omitted. Materials not distributed to investors "should rarely be considered part of the total mix of information," *United Paperworkers*, 985 F.2d at 1199-1200; *Facebook*, 986 F. Supp. 2d at 521-22. And whether outside publications made further disclosure unnecessary is a question of fact. *WorldCom*, 346 F. Supp. 2d at 688-89.

Cir. 2005). No "corrective disclosure" is required; "[w]hether the truth comes out by way of a corrective disclosure ... or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-62 (2d Cir. 2016); *Didi*, 2024 WL 1119483, at *18. The Second Circuit applied exactly this reasoning to an undisclosed pump-and-dump risk in *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.*, 343 F.3d 189, 197 (2d Cir. 2003): the decline was a "foreseeable consequence of defendants' omissions," and whether "the loss was caused by an intervening event" is "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." AC¶¶14-18, 118-28, 152.

**F. The Section 15 Claim Is Adequately Pleaded.**

The AC pleads Shi and Xu are PomDoctor's co-founders, its CEO and CFO, and its controlling shareholders through super-voting Class B shares; that they signed the Registration Statement; and that they controlled its contents. AC¶¶31-32, 35, 146, 159-62. That suffices. *Winter*, 686 F. Supp. 3d at 304, 312; *Hub*, 2025 WL 872078, at *18 (signing suffices at the pleading stage, and Section 15, unlike Section 20(a), requires no showing of "culpable conduct").

**G. The Section 11 Claim Against Cogency Is Adequately Pleaded.**

Cogency signed the Registration Statement as PomDoctor's "authorized U.S. representative," acting through its Senior Vice President.[18] AC¶¶34, 37, 148. Section 11 reaches "every person who signed the registration statement," 15 U.S.C. § 77k(a)(1), and the Act requires a foreign issuer's registration statement to be signed by "its duly authorized representative in the United States," 15 U.S.C. § 77f(a). "There is no mechanism under the 1933 Act for a signatory to limit their responsibility for statements in a registration statement"; "liability depends on whether

[18] Registration Statement, Part II, at II-7 (Form F-1/A, filed Sept. 26, 2025), https://www.sec.gov/Archives/edgar/data/1877971/000121390025092301/ea0200019-21.htm

a person signed the Registration Statement, not on whether they were required to do so under another section of the Act." *Glenmede Tr. Co. v. Infinity Q Cap. Mgmt. LLC*, 248 A.D.3d 562, 565-67 (1st Dep't 2026). Judge Koeltl accordingly sustained Securities Act claims against Cogency and the same officer who signed here, rejecting the arguments that she signed only "as an employee of Cogency" and that a "duly authorized representative" cannot be held liable. *Cloopen*, 661 F. Supp. 3d at 238-39; *accord Glenmede*, 248 A.D.3d at 567 (following *Cloopen*).

Cogency claims the AC pleads no "wrongful conduct," "knowledge," or "role" on Cogency's part. Dkt. 80 at 2. But under Section 11, a signatory is strictly liable for a materially misleading registration statement unless it proves its own due diligence, *Morgan Stanley*, 592 F.3d at 359; *Panther II*, 681 F.3d at 120, and that affirmative defense is "unavailing as a means of defeating a motion to dismiss," *Winter*, 686 F. Supp. 3d at 310.

## IV. CONCLUSION

PomDoctor Defendants' motion to dismiss and Cogency's joinder should be denied in their entirety. In the alternative, Plaintiffs request leave to amend. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

Dated: October 23, 2026
New York, New York

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Samantha Daniels*
Jeremy A. Lieberman
J. Alexander Hood II
Samantha Daniels
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
jalieberman@pomlaw.com
ahood@pomlaw.com
sdaniels@pomlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Jing Chen
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060

Co-Lead Counsel for Lead Plaintiffs and the Class

## CERTIFICATE OF WORD COUNT

The undersigned, Co-Lead Counsel of record for Lead Plaintiffs and the Class, certifies that this brief contains 8,746 words, which complies with the word limit of Local Civil Rule 7.1(c).

Executed on October 23, 2026.

*/s/ Samantha Daniels*
Samantha Daniels

**CERTIFICATE OF SERVICE**

I, Samantha Daniels, hereby certify that on October 23, 2026, I authorized a true and correct copy of the foregoing to be electronically filed with the clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

*/s/ Samantha Daniels*
Samantha Daniels